## HEISLER *v.* THOMAS COLLIERY COMPANY ET AL.

ERROR TO THE SUPREME COURT OF THE STATE OF PENNSYL-
VANIA.

No. 541. Argued November 14, 15, 1922.—Decided November 27, 1922.

1. In view of the differences between anthracite and bituminous coals in properties and uses, a Pennsylvania tax is not unreasonable

and arbitrary because levied on the one but not on the other, and is therefore unobjectionable under the equal protection clause of the Fourteenth Amendment. P. 254.

2. The commercial competition between these two products is not a sufficient reason against classifying them separately for taxation purposes. P. 257.

3. The fact that useful products are obtained from bituminous coal which are not produced from anthracite serves to justify the state policy of favoring the former in taxation. P. 257.

4. Whether a statute or action of a State impinges on interstate commerce, depends upon the statute or action, and not upon what was said about it or the motive that impelled it. P. 258.

So *held*, where it was argued that anthracite being virtually confined in production to Pennsylvania but largely consumed by the necessities of other States, the tax law in question was advocated by the Pennsylvania governor as a means of levying tribute on the other-state consumption.

5. A state act regulating interstate commerce is invalid, whatever the degree of interference. P. 259.

6. The Pennsylvania tax on anthracite when prepared and "ready for shipment or market," as applied to coal destined to have a market in other States but not as yet moved from the place of production or preparation, is not an interference with interstate commerce. P. 259. *Coe v. Errol*, 116 U. S. 517.

7. The fact that the statute imposes the tax when the coal "is ready for shipment or market" does not prove it an intentional fraud on the commerce clause. P. 261.

274 Pa. St. 448, affirmed.

ERROR to a decree of the Supreme Court of Pennsylvania, affirming a decree of a lower court, which dismissed a bill brought by Heisler, as a stockholder, to enjoin the Colliery Company and its trustees from paying a state tax and defendant state officials from enforcing it.

*Mr. Louis Marshall* for plaintiff in error.

The producers of anthracite coal in Pennsylvania are denied the equal protection of the laws because the *ad valorem* tax imposed by the Act of 1921 is not made applicable to bituminous or other kinds or grades of coal produced in the State. Citing numerous cases and dis-

cussing: *Commonwealth* v. *Alden Coal Co.,* 251 Pa. St. 124; *District of Columbia* v. *Brooke,* 214 U. S. 138; *Bell's Gap R. R. Co.* v. *Pennsylvania,* 134 U. S. 232; *Barbier* v. *Connolly,* 113 U. S. 27; *Southern Ry. Co.* v. *Greene,* 216 U. S. 400; *Royster Guano Co.* v. *Virginia,* 253 U. S. 412; *People ex rel. Farrington* v. *Mensching,* 187 N. Y. 8; *Hauser* v. *North British & Mercantile Ins. Co.,* 206 N. Y. 455; *State* v. *Julow,* 129 Mo. 163.

*Mr. George E. Alter,* Attorney General of the State of Pennsylvania, with whom *Mr. Emerson Collins* and *Mr. George Ross Hull* were on the brief, for defendants in error.

*Mr. J. Weston Allen,* Attorney General of the State of Massachusetts, as *amicus curiae,* by special leave of court. *Mr. Edwin H. Abbot, Jr.,* Assistant Attorney General of that State, and *Mr. Charles D. Newton, Mr. Thomas F. McCran, Mr. Ransford W. Shaw, Mr. Oscar L. Young, Mr. Frank C. Archibald, Mr. Herbert Ambrose Rice, Mr. Frank E. Healy* and *Mr. Sylvester D. Townsend, Jr.,* Attorneys General respectively of the States of New York, New Jersey, Maine, New Hampshire, Vermont, Rhode Island, Connecticut and Delaware, were on the briefs.

The question whether a state law is permissible regulation of local affairs or a forbidden regulation of interstate commerce does not depend upon whether that law purports to regulate interstate commerce *eo nomine* or by express words. On the contrary, it depends upon the actual operation of the law upon interstate commerce under the particular circumstances.

The question whether the exercise of state powers upon matters within their apparent scope is in fact a direct burden upon or regulation of interstate commerce, and is therefore forbidden, or merely remotely and incidentally affects such commerce, and is therefore permitted, is frequently one of degree. The dividing line " is to be

pricked out by the gradual contact of opposing decisions."
*Noble State Bank* v. *Haskell*, 219 U. S. 104.

The power of a State to impose ordinary and general
property taxes without discrimination upon the mass of
property within its borders extends to the whole mass
even though some portion of that mass has come from
other States or is about to be shipped into other States;
and the test as to whether this class of taxes burdens in-
terstate commerce is whether the goods are at rest within
the State. If they have not begun to move in interstate
commerce, or if the interstate movement is complete, such
property taxes may be levied. It may be observed that a
different rule would exempt from the general taxes ordi-
narily levied upon personal property a large mass of
property either because it had once moved in interstate
commerce or might so move in the future.

But the very cases which uphold ordinary property
taxes upon property at rest within the State recognize
that no special or discriminatory tax may be imposed
either because the goods have been shipped into the State
or are about to be shipped out of it. *Brown* v. *Houston*,
114 U. S. 622; *Coe* v. *Errol*, 116 U. S. 517; *Pittsburg &
Southern Coal Co.* v. *Bates*, 156 U. S. 577; *Diamond
Match Co.* v. *Ontonagon,* 188 U. S. 82; *American Steel
& Wire Co.* v. *Speed*, 192 U. S. 500; *Bacon* v. *Illinois*,
227 U. S. 504.

There is ample authority to sustain the distinction
between the general ordinary and non-discriminatory
property tax and the special tax intended to discriminate
against goods because of their relation to interstate com-
merce. Thus, a general and non-discriminatory tax upon
selling goods which have become part of the general mass
of property within the State is valid. *Emert* v. *Missouri*,
156 U. S. 296; *Woodruff* v. *Parham*, 8 Wall. 123. But a
special tax upon " goods, wares and merchandise which
are not the growth, produce or manufacture of this state "

is void, as a discrimination against interstate commerce, even though the goods have become a part of the general mass of property within the State. *Welton* v. *Missouri,* 91 U. S. 275; *Cook* v. *Pennsylvania,* 97 U. S. 566; *Guy* v. *Baltimore,* 100 U. S. 434; *Webber* v. *Virginia,* 103 U. S. 344; *Walling* v. *Michigan,* 116 U. S. 446; *Minnesota v. Barber,* 136 U. S. 313; *Darnell & Son Co.* v. *Memphis,* 208 U. S. 113; *New York Trust Co.* v. *Eisner,* 256 U. S. 345, 348, *semble; Bethlehem Motors Corp.* v. *Flynt,* 256 U. S. 421. Cf. *Philadelphia S. S. Co.* v. *Pennsylvania,* 122 U. S. 326; *Galveston, Harrisburg & San Antonio Ry. Co.* v. *Texas,* 210 U. S. 217; *Crew Levick Co.* v. *Pennsylvania,* 245 U. S. 292.

In principle the cases just considered govern the case at bar. It is true that many of them condemn what is in effect a special discriminatory tax on goods shipped into the State, levied after those goods have become a part of the general mass of property within the State by reason of such interstate shipment, while the case at bar concerns a tax which, we contend, is imposed upon goods about to be shipped out of the State by reason of such interstate or foreign shipment. But that distinction cannot avail even if it be pressed. What is condemned is a discrimination because of interstate shipment whether the movement be into the State or out of the State. Outward movement is as much within the protection of the commerce clause as inward movement. *Coe* v. *Errol,* 116 U. S. 517; *Diamond Match Co.* v. *Ontonagon,* 188 U. S. 82; *Almy* v. *California,* 24 How. 169; *Fairbank* v. *United States,* 181 U. S. 283; *United States* v. *Hvoslef,* 237 U. S. 1; *Thames & Mersey Marine Ins. Co.* v. *United States,* 237 U. S. 19; *New York & Cuba Mail S. S. Co.* v. *United States,* 125 Fed. 320.

Even if it be assumed, without conceding, that this tax is imposed upon this coal while it is still a part of the general mass of property in Pennsylvania, and before it

has actually begun to move in interstate commerce to other States or foreign countries, the tax is none the less void if in fact it operates as a discrimination against such outward moving commerce.    As the tax is imposed directly upon the coal at the moment before shipment, it is unnecessary to argue at length the proposition that the tax is not upon the coal, but upon some person or thing which the State could lawfully tax.    It is enough to point out that such devices have been uniformly condemned by this Court, if in fact the tax ultimately must be borne by the goods.    Thus, a tax upon the person who sells the goods is a tax upon the goods. *Brown* v. *Maryland,* 12 Wheat. 419; *Welton* v. *Missouri,* 91 U. S. 275; *Davis* v. *Virginia,* 236 U. S. 697.    So also a discriminatory charge made for the use of a wharf ultimately falls upon the goods and is equally condemned. *Guy* v. *Baltimore,* 100 U. S. 434.    So also a special and burdensome license tax imposed upon maintaining an office for the transaction of interstate commerce cannot be upheld. *Rosenberger* v. *Pacific Express Co.,* 241 U. S. 48.    And special burdens imposed upon foreign corporations engaged in interstate commerce as a condition to suit upon interstate accounts cannot be sustained. *Sioux Remedy Co.* v. *Cope,* 235 U. S. 197.    Similarly, a stamp tax imposed upon all bills of lading, manifests, charter parties or policies of marine insurance is void as to such documents used in interstate or foreign commerce, *United States* v. *Hvoslef,* 237 U. S. 1; *Thames & Mersey Marine Ins. Co.* v. *United States,* 237 U. S. 19; *New York & Cuba Mail S. S. Co.* v. *United States,* 125 Fed. 320; and is doubly bad if it is specifically directed at the documents used in such commerce. *Almy* v. *California,* 24 How. 169; *Fairbank* v. *United States,* 181 U. S. 283.

In connection with the stamp tax cases it may be observed that the goods had not started upon their foreign journey, but the tax was overthrown notwithstanding

because it inevitably imposed a burden upon interstate or foreign commerce whether the goods had already started or not.

That the essential test is whether the tax in fact burdens interstate commerce, even though in terms laid upon some privilege or thing which the State has unquestioned jurisdiction to tax, is well illustrated by those cases which hold that where a foreign corporation is doing both local and interstate business, the State cannot impose a license fee for doing local business in such a manner or in such amount that it burdens the interstate business. *Western Union Tel. Co.* v. *Kansas,* 216 U. S. 1; *Pullman Co.* v. *Kansas,* 216 U. S. 56; *Ludwig* v. *Western Union Tel. Co.,* 216 U. S. 146; *International Paper Co.* v. *Massachusetts,* 246 U. S. 135.

If these cases are considered in connection with the cases to the effect that a State cannot exert its undoubted power to regulate local rates in such a manner as to interfere with national regulation of interstate rates (*New York* v. *United States,* 257 U. S. 591), it is plain that if this tax does in fact burden interstate commerce the exaction of it before the goods have begun to move (if that be the fact) cannot save it. This is perhaps simply another way of saying that a State cannot discriminate against interstate commerce even by exerting its undoubted powers upon matters clearly within its jurisdiction.

Apply these principles to the present case. Pennsylvania has a natural monopoly of anthracite coal in this country. That coal is a prime necessity of life, especially in the northeastern States. Eighty per cent of such coal is shipped out of Pennsylvania. The Thomas Colliery so ships 67 per cent of its anthracite. It is therefore a proper party to present this question here.

The declared intention at the time this act was passed was so to use the natural monopoly which Pennsylvania possesses as to compel the inhabitants of other States to

pay a tax to Pennsylvania by collecting a special tax from the colliery which would inevitably pass such tax on to the consumer.

In order to avoid constitutional difficulties so far as might be, the act provides that the tax shall be imposed when the coal " is ready for shipment or market." As a practical matter, the tax would have exactly the same operation and effect, so far as coal shipped out of the State is concerned, if it had been exacted at the boundary line of the State as an express export duty. The selection of the moment before the coal moves (if that moment has been effectively selected) is a plain and intentional fraud upon the commerce clause. Cf. *Hammer* v. *Dagenhart,* 247 U. S. 251; *Child Labor Tax Case,* 259 U. S. 20; *Hill* v. *Wallace,* 259 U. S. 44.

As this coal has already borne its full share of ordinary, non-discriminatory property taxes (which are the kind of taxes permitted by *Coe* v. *Errol,* 116 U. S. 517), to sustain this additional and discriminatory tax imposed upon anthracite coal alone would permit the holder of a natural monopoly to use the channels of interstate commerce to tax persons in other States to the extent of about $6,000,-000 a year, of which about $3,600,000 will be paid by the States which here protest as *amici curiae.*

The question at issue extends far beyond the validity or invalidity of the particular tax in question. It will establish a far reaching principle for good or ill. If the tax be upheld, it is inevitable that every State which possesses natural resources essential to other States will impose similar taxes in order to make those whom it cannot directly and constitutionally tax contribute to its exchequer through the channels of commerce. Indeed, several States may combine so as to create absolute monopolies by the enactment of uniform laws exacting taxes similar to this. Such a situation would bring back the commercial conflicts between the States which the com-

merce clause was enacted to prevent. A result so absolutely repugnant to both the letter and the purpose of the commerce clause ought not to be permitted.

Mr. Justice McKenna delivered the opinion of the Court.

In 1913 the Commonwealth of Pennsylvania, by an act of its General Assembly [P. L. 1913, p. 639], imposed a tax of 2½% upon anthracite coal, and provided for the distribution of the tax.

The act was adjudged a violation of the constitution of the Commonwealth which required uniformity of taxation. *Commonwealth* v. *Alden Coal Co.*, 251 Pa. St. 134, and *Commonwealth* v. *St. Clair Coal Co.*, 251 Pa. St. 159.

In 1921 the Commonweath passed the act here involved. [P. L. 1921, p. 479.] It provided that from and after its passage each ton of anthracite coal mined, "washed, screened, or otherwise prepared for market," in the Commonwealth should be "subject to a tax of one and one-half per centum (1½) of the value thereof when prepared for market." It was provided that the tax should be assessed at the time when the coal has been subjected to the indicated preparation "and is ready for shipment or market."

Plaintiff in error, alleging himself to be a stockholder of the Thomas Colliery Company, brought this suit to have the act adjudged and decreed to be unconstitutional and void, and to enjoin that company and its directors from complying with the act, and to enjoin defendant in error, Samuel S. Lewis, Auditor General of the Commonwealth, and the defendant in error, Charles A. Snyder, Treasurer of the Commonwealth, from enforcing the act.

The trial court, Court of Common Pleas, decided against the relief prayed, distinguishing the case from those in which the Act of 1913 was declared void, and adjudged and decreed that the suit be dismissed. The ruling was affirmed

by the Supreme Court of the State. The case is here on writ of error to that action.

The bill in the case, as far as we are concerned with it, assails the Act of 1921 as offensive to the Fourteenth Amendment of the Constitution of the United States, in that it denies to the Thomas Colliery Company, and other owners and operators of anthracite mines, the equal protection of the laws, because it taxes such owners and anthracite coal, and does not tax the owners of bituminous mines and bituminous coal. The ultimate foundation of the contention is that anthracite coal and bituminous coal are fuels and necessarily, therefore, must be associated in the same class for taxation, in disregard or in diminution of whatever other differences may exist between them in composition, qualities or uses, and that not to so associate them is arbitrary and unreasonable, having the consequences of inequality and illegality, and, therefore, within the ban of the Constitution of the United States.

The contention, therefore, concentrates attention upon the consideration of what resemblances or differences in objects justify their inclusion in, or their exclusion from, a particular class.

It would be commonplace and wearisome to enlarge much upon the principle that presides in and determines the classification of objects. It is too necessary and too familiar in the affairs of life. We cannot go far in thought or practice without its exercise. It is the process of considering objects together or in separation as determined by their properties or some of them, and the purpose we have in hand. If the properties and purpose have relation, the process is logically justified.

Illustrations readily occur. A farmer will classify plants differently from a botanist, but the classifications of both may, notwithstanding the difference, be logically proper.

And so classification has uses in government—indeed, we may say, necessities in government, for government as well as persons has purposes, varied and, at times, exigent, and its legislation must be accommodated to them, either in convenience or necessity. That government has the power to do so, we have often pronounced; not, however, omitting to recognize the restraints upon the power while expressing its range and adaptation. In its exercise in taxation, we have said, it is competent for a State to exempt certain kinds of property and tax others, the restraints upon it only being against "clear and hostile discriminations against particular persons and classes." Discriminations merely are not inhibited, for, it was recognized, that there are "discriminations which the best interests of society require." *Bell's Gap R. R. Co.* v. *Pennsylvania,* 134 U. S. 232, 237.

The principle of that case, and its concession to the power of a State, has received expression and illustration in cases which concerned the exercise of the power in the classification of objects for taxing purposes. In *Watson* v. *State Comptroller,* 254 U. S. 122, 124, it is said, "Any classification is permissible which has a reasonable relation to some permitted end of governmental action. . . . It is enough, for instance, if the classification is reasonably founded in 'the purposes and policy of taxation.'" In other cases it is said that facts which can be reasonably conceived of as having existed when the law was enacted will be assumed to justify it. *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61, 78; *Crescent Cotton Oil Co.* v. *Mississippi,* 257 U. S. 129, 137. And "it makes no difference that the facts may be disputed or their effect opposed by argument and opinion of serious strength. It is not within the competency of the courts to arbitrate in such contrariety." *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342, 357, and cases there cited. And further, the purpose of the legislation may not be the correction of some

definite evil but may be only to remove " obstacles to a greater public welfare." See also, as to classification by legislation and its consonance to the requirements of the Fourteenth Amendment, *District of Columbia* v. *Brooke,* 214 U. S. 138, 150.

Is there a guide in these cases to decision, or is it to be found in the cases cited by the plaintiff in error, which express the admonition and restraint that a classification to be justified must not be unreasonable or arbitrary? To answer, a comparison of the coals becomes necessary. In making it, the first fact we encounter is a difference in their names, and as names of things are considered significant of their attributes, the names, it may be assumed, announce a difference in attributes, and as dependent upon it, a difference in uses. Resemblances, however, are alleged in the bill and not denied in the answer, which, it is alleged, essentially assimilate the coals and make arbitrary the selection of one for taxation and not the other.

The detail is interesting. It includes the description of the processes of nature in the formation of the coals, their particular properties, composition and appearances, and the localities of their production. Anthracite coal, it is said, is found only in nine counties out of sixty-seven in the State of Pennsylvania; bituminous coal in twenty-four counties. Both are sold, is the allegation, to places outside of the State and in competition for fuel purposes, and that the anthracite in certain sizes, termed steam sizes, competes with bituminous coal, and certain subgrades (intermediate grades) of the latter with certain subgrades of anthracite.

But we need not dwell further on these considerations. The fact of competition may be accepted. Both coals, being compositions of carbon, are of course capable of combustion and may be used as fuels, but under different conditions and manifestations: and the difference deter-

mines a choice between them even as fuels. By disregarding that difference and the greater ones which exist, and by dwelling on competition alone, it is easy to erect an argument of strength against the taxation of one and not of the other. But this may not be done. The differences between them are a just basis for their different classification; and the differences are great and important. They differ even as fuels; they differ fundamentally in other particulars. Anthracite coal has no substantial use beyond a fuel; bituminous coal has other uses. Products of utility are obtained from it. The fact is not denied and the products are enumerated, and the extent of their use.[1] They are, therefore, incentives to industries that the State in natural policy might well hesitate to obstruct or burden; and to yield to the policy or consider it, is well within the concession of the power of the State expressed in the cases we have cited. The distinction in the treatment of the respective coals being within the power conceded by the cases to the State, it has logical and legal justification and is, necessarily, not unreasonable or arbitrary. We concur, therefore, in the decision of the Supreme Court of the State sustaining the Act of 1921.

---

[1] The differences of the coals and their respective uses were found by the Court of Common Pleas and the Supreme Court. One of the findings is as follows: "We find that anthracite coal differs from bituminous coal in its physical properties, namely, the amount of fixed carbon, the amount of volatile matter, color, lustre, and structural character. The percentage of fixed carbon in anthracite is much higher and the percentage of volatile matter much lower, than in bituminous coal. Anthracite coal is hard, compact, and comparatively clean and free from dust, while bituminous coal is softer, dusty and dirty." The court also observed that it was persuasive of the difference between the coals that the Congress of the United States and the Canadian Parliament, in levying import taxes, put the coals in different classes, and that the railroads of Pennsylvania so separated them, and that, therefore, quoting another, the classification was "one which actually exists in the business world."

45646°—23——17

Anthracite coal, as we have observed, is asserted to be found in only nine counties in the State, and practically nowhere else in the United States. The fact, it is further said, gives the State a monopoly of it, and that a tax upon it is levying a tribute upon the consumption of other States, and nine of them have appeared by their attorneys general to assail it as illegal and denounce it as an attempt to regulate interstate commerce. In emphasis of the contention, the Governor of the State is quoted as urging the tax because of that effect. The fact, tribute upon the consumers of the coal in other States, is pronounced inevitable, as, it is the assertion, 80% of the total production is shipped to other States, and that this constitutes its ": major 'market.'" And the dependency upon Pennsylvania is represented as impossible of evasion or relief. Anthracite coal, is the assertion, has become a prime necessity of those States, " particularly for domestic purposes " and even " municipal laws and ordinances have been passed forbidding the use of other coal for heating purposes."

The representation is graphic, but the first impression it makes is that it is in contradiction of the contention of the plaintiff in error that the tax discriminates against anthracite coal; for certainly there cannot be that complete competition and identity of use as a fuel between that coal and bituminous coal when there is such a difference between them as fuels that the use of one is enjoined by law and the other, in effect, prohibited.

This, however, only in passing. We will consider the contentions of the attorneys general, independently of the contentions of plaintiff in error, and assume that the antagonism, if existing, between the contentions, may in some way, not now appearing, have reconciliation.

The contention that the tax is a regulation of interstate commerce seems to be based somewhat upon the declaration of the Governor of the State of its effect upon con-

sumers in other States. We are unable to discern in the fact any materiality or pertinency, nor in the fact that Pennsylvania has a monopoly (if we may use the word) of the coal. Whether any statute or action of a State impinges upon interstate commerce depends upon the statute or action, not upon what is said about it or the motive which impelled it, and a tax upon articles in one State that are destined for use in another State cannot be called a regulation of interstate commerce, whether imposed in the certainty of a return from a monopoly existing, or in the doubt and chances because of competition. The action of the State as a regulation of interstate commerce does not depend upon the degree of interference; it is illegal in any degree.

We may, therefore, disregard the adventitious considerations referred to and their confusion, and by doing so we can estimate the contention made. It is that the products of a State that have, or are destined to have, a market in other States, are subjects of interstate commerce, though they have not moved from the place of their production or preparation.

The reach and consequences of the contention repel its acceptance. If the possibility, or, indeed, certainty of exportation of a product or article from a State determines it to be in interstate commerce before the commencement of its movement from the State, it would seem to follow that it is in such commerce from the instant of its growth or production, and in the case of coals, as they lie in the ground. The result would be curious. It would nationalize all industries, it would nationalize and withdraw from state jurisdiction and deliver to federal commercial control the fruits of California and the South, the wheat of the West and its meats, the cotton of the South, the shoes of Massachusetts and the woolen industries of other States, at the very inception of their production or

growth, that is, the fruits unpicked, the cotton and wheat ungathered, hides and flesh of cattle yet " on the hoof," wool yet unshorn, and coal yet unmined, because they are in varying percentages destined for and surely to be exported to States other than those of their production.

However, we need not proceed further in speculation and argument. Ingenuity and imagination have been exercised heretofore upon a like contention. There is temptation to it in the relation of the States to the Federal Government, being yet superior to the States in instances, or rather, having spheres of action exclusive of them. The instances cannot in all cases be precisely defined. And the uncertainty attracts disputes, and is availed of to assert or suppose collisions which, in fact, do not exist. There is illustration in the cases. In *Coe* v. *Errol*, 116 U. S. 517, the precise contention here made was passed upon and rejected. It involved the taxing power of a State, and the property subject to it (timber cut in its forests) was intended for exportation and had progressed nearer to exportation than the coal in the present case.

The question in the case was said to be " whether the products of a State (in this case timber cut in its forests) are liable to be taxed like other property within the State, though intended for exportation to another State, and partially prepared for that purpose by being deposited at a place of shipment, such products being owned by persons residing in another State." And again, " Do the owner's state of mind in relation to the goods, that is, his intent to export them, and his partial preparation to do so, exempt them from taxation? " In answer to the questions, the point of time when goods cease to be under the power of the State and come under the protection of the Constitution was considered. To express it, as the Court did, " there must be a point of time when they [goods] cease to be governed exclusively by the domestic law and

begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the State of their origin to that of their destination."

And again, " nor is exportation begun until they are committed to the common carrier for transportation out of the State to the State of their destination, or have started on their ultimate passage to that State." Until then, it was said, that they were a part of the general mass of property of the State, and subject to its jurisdiction.

Other cases have decided the same and afford illustrations of it. *Cornell* v. *Coyne,* 192 U. S. 418; *Susquehanna Coal Co.* v. *South Amboy,* 228 U. S. 665; *Bacon* v. *Illinois,* 227 U. S. 504; *General Oil Co.* v. *Crain,* 209 U. S. 211; *United Mine Workers* v. *Coronado Coal Co.,* 259 U. S. 344.

The effect of these cases is attempted to be evaded by the assertion that the statute, in imposing the tax when the coal " ' is ready for shipment or market,' is a plain and intentional fraud upon the commerce clause." We cannot accept the accusation as justified, or that the situation of the coal can be changed by it and as moving in interstate commerce when it is plainly not so moving. The coal, therefore, is too definitely situated to be misunderstood, and the cases cited to establish a different character and subjection need not be reviewed.

*Decree affirmed.*