**UTAH POWER & LIGHT CO. v. PFOST,**
Commissioner of Law Enforcement
of Idaho, et al.

No. 1621.

District Court, D. Idaho, S. D.

Dec. 30, 1931.

Hawley & Worthwine, of Boise, Idaho, and Merrill & Merrill, of Pocatello, Idaho (Geo. R. Corey, of Salt Lake City, Utah, and John F. MacLane, of New York City, of counsel), for plaintiff.

Fred J. Babcock, Atty. Gen., and Sidman I. Barber and Maurice H. Greene, Asst. Attys. Gen., for defendants.

Before SAWTELLE, Circuit Judge, and WEBSTER and CAVANAH, District Judges, as a statutory three-judge court.

CAVANAH, District Judge.

In the original opinion of the court rendered on August 20, 1931, on the motions to dismiss and for an interlocutory injunction, 52 F.(2d) 226, we considered and disposed of all questions presented, excepting the remaining one of fact as to whether the tax imposed by the act (Laws Idaho 1931, Ex. Sess., c. 3) was in its application to the plaintiff, a burden on interstate commerce, as there appeared from the bill and the affidavits filed a real controversy over material questions of fact which could not have been satisfactorily determined by the bill and affidavits, so a master was appointed to take the testimony and report the same without findings or recommendations of decree. The case is now again before the court upon the testimony for a final determination of the issue thus stated.

The purpose of the legislative act in question is not in any manner to infringe on interstate commerce, but is to require the payment of a license tax upon all electricity and electrical energy generated in the state of Idaho for barter, sale, or exchange. It is limited to such electricity and electrical energy as is generated in the state, and applies to the practical operations of those systems from which it can be determined the amount of electricity and electrical energy so generated, as it requires the payment of one-half mill per kilowatt hour on all electricity and electrical energy so generated and produced in the state, measured at the place of production by the installation at the point of production by the producer of recording watt. hour meters or other suitable instruments of a type to be approved by the commissioner of law enforcement, although such electricity and electrical energy may in part enter its journey in interstate commerce. Under the act the determination of the amount of electricity and electrical energy must be measured at the place of production, and is based on the number of kilowatt hours.

Our crucial question, therefore is: Does the act when applied to the practical operation of the plaintiff's electrical system infringe upon the commerce clause of the Constitution? The principle applicable to this inquiry is, as stated in our original opinion, that, where the production and delivery of the product is essentially local in character and not essentially national and the local interest is paramount, the question as to whether it actually burdens interstate commerce must be determined from the various circumstances in each case. The movement of the commodity for another state must have actually begun and is going on, and the character of the transportation depends upon the circumstances looking to what the owner had done in preparation for the journey and in carrying it out. Turning then to the evidence and testing it by this rule, a brief summary of it is indispensable to fully understand the nature of the plaintiff's operations. The manner of production and place of origin of the electricity and electrical energy generated by the plaintiff is testified to by some of the most noted engineers and physicists of the country, and, as usual among experts, there appears a difference of opinion relating to the practical and scientific view.

The weight of the evidence discloses that the plaintiff is engaged in the generation, transmission, delivery, and sale of electrical power and energy to its consumers, in the states of Idaho, Utah, and Wyoming, delivered at the point where the company's wires or apparatus are connected with those of the consumers, and the total energy generated by it at all of its Idaho stations for the year 1930 was 233,253,000 kilowatt hours, of which 199,968,000 kilowatt hours were generated at its Bear River Station in Idaho, and 33,285,000 kilowatt hours were generated at its other Idaho stations. Of the kilowatt hours so generated, 6,978,000 kilowatt hours were its station use at Idaho stations, and 24,046,000 kilowatt hours delivered to its Idaho consumers and its use at its division offices, and 198,502,000 kilowatt hours for transmission to Utah. The measured output of the Bear River Station in Idaho is 161,649,000 kilowatt hours. There are meters placed in the several stations showing the output in kilowatt hours, and the amount of electrical power or energy delivered to the consumers is measured by meters at the consumers' point of use. At the generating stations the amount of energy generated and the output to the transmission lines is measured as the plaintiff has determined that fact in kilowatt hours by meter measurements from the generator to the transmission line. The essential apparatus interspersed in the system to accomplish the transfer of the energy from the falling water to the place of use are generators, transformers, and transmission lines. The generator is a device for converting mechanical energy into electrical energy and by which the energy drawn from the water is changed from one form to another and

passed along. The transmission losses are dependent upon the transmission system, not upon the generating system and can be determined by the installation of meters on the line of the system at various parts of it under given conditions. Energy for commercial purposes may be measured by meters placed outside of the generators, which is the first place at which energy transferred through the generator may be measured. These meters measure the energy flowing past the point at which the meter is connected, and the amount of the energy which reaches the transformer can be accurately measured at any point on the line and which is done as a commercial operation. The dispatcher at the stations, by opening or closing of the different switches, can direct the output of a certain station available to consumers over that transmission net work. While there appear differences of opinion among the engineers and scientists as to whether the generation of electrical energy can be determined at the place of production and before it reaches the point of use, yet we are impressed with the view expressed by those who have testified that it can be measured and the amount accurately determined by the installation of meters or other proper instruments at the place of production, and especially is that true when we consider the testimony of Mr. Hale, the chief engineer of the plaintiff, to the effect that in the operation of the system the plaintiff determines with accuracy its meter number of kilowatt hours of energy generated by it in Idaho at its various generating stations and before it starts in transmission on its journey to Utah and Wyoming. This actual fact that the plaintiff is by its meters determining the number of kilowatt hours of the electrical energy at its generating stations in the state of Idaho does without doubt dispose of the contention made by the plaintiff that electrical energy cannot be measured and determined at the generator and before it is transmitted to the consumers. The witness Rupp, who qualified and ventured an opinion, says that the amount of electrical energy delivered can be measured at any point on the line of the system. If then the energy can be measured and determined at its place of production, being the generator, or anywhere on the line before it enters upon its journey in interstate commerce, it is quite clear that the production of the energy in the manner in which plaintiff is doing is essentially local in character and not essentially national, although it is in part thereafter transmitted in interstate commerce. What the plaintiff is doing in the first instance is generating electrical energy from one of the natural resources of the state, the falling water, and the fact that thereafter it transmits and sells it both in and out of the state does not burden interstate commerce upon the principle recognized by the Supreme Court.

We must not forget the fact that the generator makes the energy available in the form as electrical energy, but as generated it cannot be transmitted over the system. The transformer seems necessary in preparing it for its final journey through the induction of a current of higher voltage, as it is used to raise or lower the voltage with corresponding decreases or increases in current. So generation of energy precedes transmission and use, as it must first be converted into electrical energy, a process complete before the pulses of energy leave the generator in their flow to the transformer.

The tax provided for by the act is not measured by the amount of electrical energy transmitted nor by the amount sold or used, but solely by production, regardless of where delivered and sold, as the act expressly provides that in the generation of electricity and electrical energy for the purposes mentioned in it the ones who do so shall pay the tax of one-half mill per kilowatt hour on the amount of such electricity and electrical energy so produced and not the amount used. We cannot yield our assent to the interpretation of the act as given by counsel for the plaintiff when applied to the operations of plaintiff's system, that the amount of kilowatt hours generated can only be measured by meters at the points of use of customers in Utah. For, as has been said, the plaintiff has determined that fact by its meters at its generation stations in Idaho, for it has given the exact number of kilowatt hours of energy generated at such stations and pleaded specific amounts of "sales in Idaho," "transmission, distribution and sub-station losses pending its business in Idaho," and "station use in Idaho for plaintiff's own purposes and not for barter, sale or exchange." Counsel for plaintiff have confused the word "production" of energy expressed in the act with transmission, use, and delivery, and their contention that the energy transmitted and delivered to Utah consumers for barter, sale, or exchange must be measured there and determined on data assembled from readings taken in Utah cannot be sustained when we remember that the act relates only to energy "produced" in the state of Idaho, which can be determined under the testimony, at "places of production" and be-

fore it is transmitted to the foreign state. The process of generating the energy is complete within the state of Idaho. The tax is not one, when applied to kilowatt hours used by Utah consumers, upon the use because the amount of energy produced may be determined at the generator and before it reaches the Utah state line. It is nothing more than a tax upon an article produced within the state which thereafter is in part transmitted in commerce. The fact that the production is in part designed for interstate commerce is immaterial. Heisler v. Thomas Colliery Company et al., 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237. Nor is the fact that the production is in response to orders for delivery without the state controlling or its production for interstate commerce itself such commerce. Oliver Iron Mining Co. v. Lord et al., 262 U. S. 172, 43 S. Ct. 526, 67 L. Ed. 929; United Mine Workers of America et al. v. Coronado Coal Co. et al., 259 U. S. 344, 42 S. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762; United Leather Workers v. Herkert & Meisel Trunk Company et al., 265 U. S. 457, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566.

To the nontechnical mind the record here convinces us that there should be no difficulty in determining to a practical certainty how much electrical energy is generated at plaintiff's generating stations in Idaho, for, as has been said, the plaintiff seems to be determining that fact with accuracy by the manner in which it is operating its system.

The thought advanced by the court in the case of South Carolina Power Co. v. South Carolina Tax Commission (D. C.) 52 F. (2d) 515, recently decided, where the same question is as to the application of a similar statute to power companies claiming to be doing interstate business, impresses us as a further reason why the act here when applied to the practical operations of plaintiff's system does not burden interstate commerce. The court in that case had before it the affidavit of Dr. Millikan, who has testified here in effect the same as what is set forth in his affidavit considered in that case, and the conclusion was there reached that the functions and operations of the transformer in the electrical processes are essential and are resorted to in order to a practical operation of the transmission lines, and that the energy generated in the generator could be determined before it was transmitted over the line into the foreign state.

In principle and the facts considered in the cases of Hope Natural Gas Co. v. Hall et al., 274 U. S. 284, 47 S. Ct. 639, 71 L. Ed. 1049, Oliver Iron Mining Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 529, 67 L. Ed. 929, and Heisler v. Thomas Colliery Co., 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237, would seem to give support in upholding the tax here.

In the case of Hope Gas Co. v. Hall et al., supra, the plaintiff, who was engaged in the production of natural gas in West Virginia, and the transportation of it through pipe lines direct from its wells into the states of Pennsylvania and Ohio, where it was delivered and sold, sought an injunction against the enforcement of a tax act of West Virginia, requiring it to pay a tax on the natural gas produced within the state and before it entered interstate commerce. It seems that most of the gas passed into interstate commerce by continuous movement from the wells. It was urged that the act burdens interstate commerce, and also to enforce it would deprive plaintiff of property without due process of law, and deny equal protection of the laws. The highest court of West Virginia (Hope Natural Gas Co. v. Hall, 102 W. Va. 272, 135 S. E. 582) held that the act was valid, but required that the value of the gas be computed upon its value at the well and not otherwise. The Supreme Court affirmed the decision of the West Virginia court, and held that the ratio of the tax, being the entire production in the state regardless of the place of sale, or that deliveries may be made to points outside the state, is not unconstitutional as respects gas transported to and sold in other states, since the highest court of West Virginia had held requiring the tax to be computed on the value of the gas at the well before it enters interstate commerce. The act here requires that the tax be computed on the amount of electricity and electrical energy at the place of production within the state of Idaho.

And again the Supreme Court has said in Oliver Iron Mining Co. v. Lord et al., supra, the plaintiff was engaged in the business of producing iron ore from mines within the state of Minnesota and the Legislature of that state enacted a law requiring it and all others who were engaged in such business to pay a tax equal to 6 per cent. of the value of the ore produced in each year. The chief contention made by the plaintiff was that mining as conducted by it was so connected with interstate commerce that to tax it is to burden such commerce, and such contention rested upon the fact that the demand or market within the state for iron ore covered only a negligible percentage of what was mined, as practically all of their output was mined to

fill contracts with consumers outside of the state and passed at once into the channels of interstate commerce. There was practically a continuity of movement from the time the ore was severed from its natural bed until it reached the consumer in the foreign state. The court reached the conclusion that the facts did not support plaintiff's contention, as mining was not interstate commerce, but, like manufacturing, is a local business subject to local regulation and taxation, and said: "The ore does not enter interstate commerce until after the mining is done, and the tax is imposed only in respect of the mining. No discrimination against interstate commerce is involved. The tax may indirectly and incidentally affect such commerce, just as any taxation of railroad and telegraph lines does, but this is not a forbidden burden or interference." So here the production of the energy is not interstate commerce, for it is produced and its production is completed and the amount thereof can be actually determined at the "place of production" within the state of Idaho and the tax reckoned according to the amount of it at the generator. American Manufacturing Company v. City of St. Louis, 250 U. S. 459, 39 L. Ed. 522, 63 L. Ed. 1084; Oliver Iron Mining Co. v. Lord, supra. Under the facts in this case the plaintiff should not treat the amount of energy reaching consumers outside of the state as the amount of the energy produced within the state, and before it enters interstate commerce.

The principle that the Legislature of the state may require those who produce a commodity in the state for sale to pay a tax upon the amount produced and to keep a record thereof before the commodity starts on its journey in interstate commerce has frequently been upheld in the light of the facts apparent in each case. The tax here is not laid on the transportation of subjects of interstate commerce or on receipts derived therefrom, but merely on the production of electrical energy generated and determined within the state from one of the natural resources of the state. The act does not, when applied to the manner in which the plaintiff operates its electrical system, burden interstate commerce, nor is it in conflict with any express enactments of Congress on the subject, nor contrary to any intention of Congress to be presumed from its silence.

Entertaining these views, we believe there should be a decree for the defendants to the effect that the interlocutory injunction heretofore granted be dissolved and that the tax required by the act with interest and costs of suit be paid by the plaintiff to the state of Idaho, less the penalty provided for in the act during the pendency of the action.