**DOUGLAS et al. v. WALLACE, Secretary of Agriculture, et al.**

No. 1624.

District Court, W. D. Oklahoma.

Oct. 17, 1934.

Henry G. Snyder, Fred B. Owen, and Walter A. Lybrand, all of Oklahoma City, Okl., for plaintiffs.

William C. Lewis, U. S. Dist. Atty., and Wade H. Loofbourrow, Asst. U. S. Dist. Atty., both of Oklahoma City, Okl., and Dwight L. Savage, Sp. Asst. to the Atty. Gen., for defendants.

VAUGHT, District Judge.

The plaintiffs, W. L. Douglas, Ed Campbell, A. W. Hullett, Homer Lane, Tom Sitlington, for themselves and on behalf of others similarly situated, bring this action against Henry A. Wallace, Secretary of Agriculture, Homer J. Cummings, Attorney General, William C. Lewis, United States District Attorney for the Western District of the state of Oklahoma, J. F. Malone, mar-

ket administrator for the state of Oklahoma, and The Evans Pure Milk Company, a corporation, Sterling Milk Company, a corporation, Southside Dairy, a corporation, and Steffens Dairy Products Company, a corporation, and allege in the bill of complaint the official status of each of the defendants, and further allege the plaintiffs and some 193 other individuals similarly situated are independent milk producers living within the trade area of Oklahoma City; that they own their own dairy herds, produce milk, and sell same to milk distributors in Oklahoma City; that all of said milk so produced and sold by the plaintiffs is consumed in Oklahoma City; that said plaintiffs are all residents of Oklahoma county, Okl., the county in which Oklahoma City is situated; that said plaintiffs produce more than 40 per cent. of the grade B milk consumed in the Oklahoma City milk area; that Oklahoma City, by ordinance, has established certain health requirements which regulate and determine the character of milk, dairy herds, and the character of equipment and the method of operation which must be met by the producers of milk in order to entitle such milk so produced to be sold for consumption in the Oklahoma City sales area, which milk is commonly known as grade B milk; and which ordinance further provides that no milk produced other than under the requirements of the ordinance can be sold for consumption in Oklahoma City.

The bill further alleges that in the year 1933 Congress passed what is known as the Agricultural Adjustment Act (7 USCA § 601 et seq.), and, under and by virtue of the authority conferred by said act upon the Secretary of Agriculture, defendant herein, there was adopted by the Secretary of Agriculture what is known as "License Series—License No. 62" (amended August 31, 1934), being a license for milk for Oklahoma City sales area, which license provides a general plan and scheme for the marketing of milk in this area, and provides the price which shall be paid by the distributors in Oklahoma City to the producers for their milk, and for the modification of said price from time to time, and that said license further provides that there shall be deducted from the average price which these plaintiffs would receive for their milk a charge to be fixed by the market administrator not to exceed 2 cents per cwt., and that there should also be deducted an additional sum equal to the deductions authorized by members of the O. K. Co-Operative Milk Association not to exceed 4 cents per cwt. A further provision

of the license is that no distributor shall purchase milk from any producer who has not signified his consent and intention to abide by all provisions and conditions of said license. These plaintiffs allege furthermore in their bill that these plaintiffs have expended large sums of money in perfecting their herds and providing the necessary equipment for maintaining them in accordance with the provisions of the city ordinance above referred to; and that the defendants The Evans Pure Milk Company, Sterling Milk Company, Southside Dairy, and Steffens Dairy Products Company, being distributors in Oklahoma City who are now and have been for many years past purchasers of the milk furnished by the plaintiffs and their associates, are prohibited under the license from purchasing the milk of these plaintiffs and their associates, and that said distributors will comply with the requirements of said license and refuse to purchase the milk of said plaintiffs, unless restrained by this court.

The plaintiffs further allege that the production of milk for sale in the Oklahoma City area is not interstate commerce; that all the milk produced by plaintiffs and those similarly situated is produced in the state of Oklahoma, and is sold to distributors in Oklahoma City, and resold to distributors in Oklahoma; and plaintiffs further allege from information and belief that no part of the said class B milk which comes within the Oklahoma city area market is produced outside of the state of Oklahoma, and that no portion of the same is sold outside of the state of Oklahoma, and therefore constitutes strictly intrastate business.

Plaintiffs further allege that the above-mentioned Agricultural Adjustment Act is not sufficiently definite and certain to entitle the Secretary to promulgate the license hereinbefore mentioned, and that the license issued by the Secretary of Agriculture and under his direction and authority by virtue of the said Agricultural Adjustment Act is in violation of the commerce clause of the Constitution of the United States (article 1, § 8, cl. 3), and will deprive these plaintiffs of their property without due process of law, and, unless the defendants be restrained from executing said license, these plaintiffs will suffer irreparable injury, and will be deprived of their property without due process of law.

The defendants filed an answer and response to the bill of complaint, one allegation in which is in effect a motion to dismiss for want of jurisdiction, no cause of

action having been stated. The answer admits the enactment of the Agricultural Adjustment Act and the license pleaded by the plaintiffs. The defendants specifically deny that the production of milk for sale in the Oklahoma City area is not interstate commerce or that the production or disposition of milk, or either of such activities in the Oklahoma City area, is solely a matter of state concern, but that said license is a valid regulation of interstate commerce; that said license effectuates the purposes of said Agricultural Adjustment Act by (1) fixing a fair and reasonable price which producers of milk shall receive for their milk and insuring receipt of such prices by them; and (2) assuring to all producers a uniform price for such milk, irrespective of the actual use of such milk made by the particular distributor which each producer supplies, and that licenses similar to that sought to be enforced in the Oklahoma City area are now in effect in some forty metropolitan areas in the United States, and that additional licenses are being formulated and will shortly be issued by the Secretary; that the Oklahoma City license and similar licenses are reasonable and appropriate means for regulating interstate commerce and increasing the flow thereof (1) by stabilizing producers' prices of milk, fluctuations in which directly affect and burden interstate commerce in manufactured dairy products, and (2) by increasing the purchasing power of dairy farmers to the end that they may in turn increase their purchases and so stimulate interstate commerce in industrial products. They further allege that the Secretary of Agriculture in issuing the license found as a fact, and defendants allege the fact to be, that the marketing of milk for consumption in the Oklahoma City sales area and the distribution thereof has been, and now is, in the current of interstate commerce.

The defendants further allege in their answer that the free flow of manufactured dairy products between markets in all sections of the country tends to establish a national price for such products as between localities only by relatively small differentials in the cost of transportation, and that the price received by the producers of milk in the Oklahoma City area affects or burdens this general current, and that this national price of milk is affected by the price paid the producers for milk produced in the Oklahoma City area, although said milk is consumed entirely in said area, and that therefore the price paid the producer in Oklahoma City indirectly affects interstate commerce, and the defendants ask that the relief prayed for by the plaintiffs be denied and the bill dismissed.

Both plaintiffs and defendants have submitted their evidence in the form of affidavits in support of their respective allegations in the bill and the answer. The cause was set down for hearing upon the application for temporary injunction, and was submitted on oral argument supplemented by written briefs.

The court is of the opinion that the allegations of the bill are sufficient to give this court jurisdiction, and therefore the motion of defendants to dismiss is overruled and exception allowed.

In considering the application for temporary injunction, the court will deal only with the facts which were admitted in the oral argument in so far as they relate to the legal questions raised by the pleadings.

The principal question to be determined by the court is whether or not the production and sale of milk in the Oklahoma City area, which milk is consumed entirely in Oklahoma City, in any way constitutes interstate commerce, or affects, interferes with, or burdens interstate commerce. This court has passed upon a similar case which involved the question of whether or not a purely intrastate transaction constitutes an interference with interstate commerce (United States v. Eason Oil Co. (D. C.) 8 F. Supp. 365, decided September 22, 1934), and the court does not deem it necessary to restate the authorities and the reasoning contained in that opinion.

The Agricultural Adjustment Act is first to be considered, which act reads in part (7 USCA §§ 601, 602) as follows:

"Sec. 601. The present acute economic emergency being in part the consequence of a severe and increasing disparity between the prices of agricultural and other commodities, which disparity has largely destroyed the purchasing power of farmers for industrial products, has broken down the orderly exchange of commodities, and has seriously impaired the agricultural assets supporting the national credit structure, it is hereby declared that these conditions in the basic industry of agriculture have affected transactions in agricultural commodities with a national public interest, have burdened and obstructed the normal currents of commerce in such commodities, and render imperative the immediate enactment of this chapter. (May 12, 1933, c. 25, Title 1, § 1, 48 Stat. 31.)

382

"Sec. 602. It is hereby declared to be the policy of Congress—

"(1) To establish and maintain such balance between the production and consumption of agricultural commodities, and such marketing conditions therefor, as will reestablish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period. The base period in the case of all agricultural commodities except tobacco shall be the prewar period, August 1909–July 1914. In the case of tobacco, the base period shall be the postwar period, August 1919–July 1929.

"(2) To approach such equality of purchasing power by gradual correction of the present inequalities therein at as rapid a rate as is deemed feasible in view of the current consumptive demand in domestic and foreign markets.

"(3) To protect the consumers' interest by readjusting farm production at such level as will not increase the percentage of the consumers' retail expenditures for agricultural commodities, or products derived therefrom, which is returned to the farmer, above the percentage which was returned to the farmer in the prewar period, August 1909–July 1914. (May 12, 1933, c. 25, Title 1, § 2, 48 Stat. 32.)"

Aside from the question as to whether or not the transactions involved in this case constitute interstate commerce or affect interstate commerce, there are two other propositions which are presented by the bill. The first is whether or not the act itself constitutes a valid delegation of legislative authority to the Secretary, and the second is whether or not the license or code adopted by the Secretary regulating the milk industry is such an exercise of legislative authority as was contemplated in the act.

Without rendering an opinion on the first proposition, the court desires to emphasize the fact that there is a most serious question as to whether or not the act itself, because of its very general terms and its lack of definite and specific instructions as to policy to the Secretary of Agriculture, constitutes such delegation of authority as was contemplated by the Constitution or has been approved by our highest court, and this court refrains from passing upon that question, for the reason that to pass upon that question is not necessary to determine the issues in this case, and for the further and more important reason that a case involving the same question is now pending before the Supreme Court, and our highest court, therefore, will in all probability pass upon the constitutionality of the act before any trial court is called upon to pass upon this important question.

The next proposition, that the license constitutes an exercise of authority by the Secretary not contemplated by the act itself, is another question of extremely serious importance, and the court refrains from passing upon that question for the reasons above stated.

That leaves only the question for determination, Does the production and sale of milk entirely within the limits of a state constitute interstate commerce or is it such an interference with or burden upon interstate commerce as to give the federal government authority to regulate the production and sale of same in any manner?

It is not necessary to analyze the license. It is a voluminous document filled with extremely technical regulations, and is a general plan regulating the purchase of milk from the producer by the distributor and the price to be paid the producer, and covers the whole question of production and disposition of milk from the producer to the consumer. It is only necessary, however, to state the substance of this license as admitted in the briefs and argument of counsel for the government. The license vests the power in the administrator to actually determine the amount in dollars and cents which the producer shall receive for his milk from the distributor, and, having agreed upon this statement, I feel that this is all that is necessary in order to determine the principal issue in this case.

The plaintiffs and their associates numbering approximately two hundred farmers, living within the vicinity of the city of Oklahoma City and within its natural trade area, all within the state of Oklahoma, own their herds, produce their milk, and sell the milk to local distributors in Oklahoma City who dispose of the milk to the consumers in Oklahoma City. It is admitted that none of this milk passes beyond the limits of the state, but is produced and consumed within the state. To assume that this constitutes interstate commerce is not only begging the question, but is so directly in conflict with every decision on the question by the Supreme Court that it is not tenable from any standpoint. If this act on the part of the farmer (the sale of his milk to the distributor) constitutes interstate commerce, then the

production and sale of eggs, wheat, corn, poultry, and all other farm products produced on the farm and sold to local merchants or distributors for use in the immediate locality constitute interstate commerce.

As stated above in United States v. Eason Oil Co., supra, this court has analyzed at great length the decisions of the Supreme Court bearing on these questions, and in no case cited by the learned counsel for the government is there any reasonable justification for reaching the conclusion urged in this case by the government.

It is admitted that there are certain intrastate transactions which are apparently intrastate from mere observation which upon investigation in fact assume a different relationship to general commerce.

In Swift & Co. v. U. S., 196 U. S. 375, 25 S. Ct. 276, 49 L. Ed. 518, which is one of the principal cases relied upon by the government, there was a combination, a conspiracy, a monopoly found by the court, whose purpose, plan, and intent were to affect interstate shipments and transactions.

In Stafford v. Wallace, 258 U. S. 495, 42 S. Ct. 397, 66 L. Ed. 735, 23 A. L. R. 229, there was involved the transactions of commission merchants at the stockyards in Chicago, but the learned court in that case held that the acts of commission merchants were not such acts as could be singled out and defined as having local significance alone, but that the stockyards constituted the throat through which the current of commerce in live stock actually passed, and that the acts of the commission merchants were a part of the transactions making possible the completed current of commerce, and not strictly intrastate.

In Chicago Board of Trade v. Olsen, 262 U. S. 1, 43 S. Ct. 470, 67 L. Ed. 839, the court held that there was in effect a conspiracy and a plan by which dealing in futures utilizing intrastate transactions directly affected the flow of interstate commerce, and that the conspiracy resulted in the fixing of a price or prices which actually dominated and controlled the trade between the States.

In Coronado Coal Co. v. United Mine Workers, 268 U. S. 295, 45 S. Ct. 551, 69 L. Ed. 963, the court held that, while coal mining is not interstate commerce, and that the power of Congress does not extend to its regulation as such, but where the intent of those who unlawfully prevented the manufacture or production was shown to be to restrain or control the supply entering and moving in interstate commerce or its price in interstate markets, that such act was in direct violation of the Anti-Trust Act (15 USCA §§ 1–7, 15), and affected the flow of interstate commerce.

The mere statement or finding either by Congress, the Secretary of Agriculture, or the Administrator, that the production and sale of milk in the Oklahoma City area is a burden upon interstate commerce, is not only not conclusive, but is not justified by the facts. To conclude that such transactions constitute interstate commerce is equivalent to the conclusion that all commerce is interstate.

The distinction between intrastate commerce and interstate commerce has been definitely made by our highest court. Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; Coe v. Errol, 116 U. S. 517, 6 S. Ct. 475, 29 L. Ed. 715; Kidd v. Pearson, 128 U. S. 1, 9 S. Ct. 6, 32 L. Ed. 346; Delaware, L. & W. R. Co. v. Yurkonis, 238 U. S. 439, 35 S. Ct. 902, 59 L. Ed. 1397; Hammer v. Dagenhart, 247 U. S. 251, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; Crescent Cotton Oil Co. v. Mississippi, 257 U. S. 129, 42 S. Ct. 42, 66 L. Ed. 166; Heisler v. Thomas Colliery Co., 260 U. S. 245, 43 S. Ct. 83, 67 L. Ed. 237; Oliver Iron Mining Co. v. Lord, 262 U. S. 172, 43 S. Ct. 526, 67 L. Ed. 929; Second Employers' Liability Cases, 223 U. S. 1, 32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44; Utah Power & Light Co. v. Pfost, 286 U. S. 165, 52 S. Ct. 548, 76 L. Ed. 1038; Chassaniol v. City of Greenwood, 291 U. S. 584, 54 S. Ct. 541, 78 L. Ed. 1004, rehearing denied, 292 U. S. 601, 54 S. Ct. 627, 78 L. Ed. 1464; Champlin Refining Co. v. Corp. Com. of Okl., 286 U. S. 210, 52 S. Ct. 559, 76 L. Ed. 1062, 86 A. L. R. 403; Ryan v. Amazon Pet. Corporation, 71 F.(2d) 1 (5th C. C. A.).

The function of the commerce clause of the Constitution is to "regulate commerce among the states" by protecting the states against each other, adopting uniform, just, and fair regulations in interstate business relations, and not to deprive the states of their guaranteed rights under their reserved powers, recognized by the Constitution.

The Supreme Court of the United States in Veazie et al. v. Moor, 14 How. (55 U. S.) 568, 573, 14 L. Ed. 545, in discussing the history and purpose of the commerce clause, said:

"The phrase can never be applied to transactions wholly internal, between citizens

of the same community, or to a polity and laws whose ends and purposes and operations are restricted to the territory and soil and jurisdiction of such community. Nor can it be properly concluded, that, because the products of domestic enterprise in agriculture or manufactures, or in the arts, may ultimately become the subjects of foreign commerce, that the control of the means or the encouragements by which enterprise is fostered and protected, is legitimately within the import of the phrase foreign commerce, or fairly implied in any investiture of the power to regulate such commerce. A pretension as far reaching as this, would extend to contracts between citizen and citizen of the same State, would control the pursuits of the planter, the grazier, the manufacturer, the mechanic, the immense operations of the collieries and mines and furnaces of the country; for there is not one of these avocations, the results of which may not, become the subjects of foreign commerce, and be borne either by turnpikes, canals, or railroads, from point to point within the several States, towards an ultimate destination, like the one above mentioned. Such a pretension would effectually prevent or paralyze every effort at internal improvement by the several States; for it cannot be supposed, that the States would exhaust their capital and their credit in the construction of turnpikes, canals, and railroads, the remuneration derivable from which, and all control over which, might be immediately wrested from them, because such public works would be facilities for a commerce which, whilst availing itself of those facilities, was unquestionably internal, although intermediately or ultimately it might become foreign.

"The rule here given with respect to the regulation of foreign commerce, equally excludes from the regulation of commerce between the States and the Indian tribes the control over turnpikes, canals, or railroads, or the clearing and deepening of watercourses exclusively within the States, the management of the transportation upon and by means of such improvements. In truth, the power vested in Congress by article 1st, section 8th of the Constitution, was not designed to operate upon matters like those embraced in the statute of the State of Maine, and which are essentially local in their nature and extent. The design and object of that power, as evinced in the history of the Constitution, was to establish a perfect equality amongst the several States as to commercial rights, and to prevent unjust and invidious distinctions, which local jealousies or local and partial interests might be disposed to introduce and maintain. These were the views pressed upon the public attention by the advocates for the adoption of the Constitution, and in accordance therewith have been the expositions of this instrument propounded by this court, in decisions quoted by counsel on either side of this cause, though differently applied by them."

The same court in United States v. Dewitt, 9 Wall. (76 U. S.) 41, 43, 19 L. Ed. 593, re-emphasizes the same construction on the commerce clause as in the preceding case: "But this express grant of power to regulate commerce among the States has always been understood as limited by its terms; and as a virtual denial of any power to interfere with the internal trade and business of the separate States; except, indeed, as a necessary and proper means for carrying into execution some other power expressly granted or vested."

In the Trade-Mark Cases, 100 U. S. 82, 96, 25 L. Ed. 550, the court said: "When, therefore, Congress undertakes to enact a law, which can only be valid as a regulation of commerce, it is reasonable to expect to find on the face of the law, or from its essential nature, that it is a regulation of commerce with foreign nations, or among the several States, or with the Indian tribes. If not so limited, it is in excess of the power of Congress. If its main purpose be to establish a regulation applicable to all trade, or to commerce at all points, especially if it be apparent that it is designed to govern the commerce wholly between citizens of the same State, it is obviously the exercise of a power not confided to Congress."

■ Counsel for the government in their brief emphasize the necessity for the enactment of the Agricultural Adjustment Act because of an existing emergency, and contend that the act is justified because of the emergency, and in support of their theory cite the recent cases of Home Bldg. & Loan Ass'n v. Blaisdell, 290 U. S. 398, 54 S. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481, and Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469. But, as this court stated in the Eason Oil Co. Case, supra, both of these cases had to do with state statutes, and there is a wide distinction between the power of Congress under the commerce clause of the Constitution and the power of the state under the powers reserved to the state and recognized by the Constitution, known as police power. The Supreme Court in both of the cases above

cited held that under the police power of the state the state legislation involved in those two cases was justified as a proper exercise of police power. Congress has no power except that which is specifically delegated to it by the Constitution. Therefore the holding of the court in the Blaisdell Case and the Nebbia Case is of no assistance to the government in the case at bar.

■ The court, therefore, having reached the conclusion that the production and sale of milk in the Oklahoma City area are wholly intrastate in their nature, and that they do not affect, interfere with, or burden interstate commerce; the judgment of the court is that the license involved in this case is unconstitutional and void and an unauthorized interference with the police powers of the state. A temporary injunction will issue. An exception is allowed defendants.