**EDGEWATER DAIRY CO., Inc., et al. v.
WALLACE, Secretary of Agriculture,
et al.**

**WALLACE, Secretary of Agriculture, et al. v.
EDGEWATER DAIRY CO., Inc., et al.
No. 13878.**

District Court, N. D. Illinois, E. D.
June 26, 1934.

K. B. Czarnecki, J. C. Kanak, A. R. See-
lig, and L. D. Schein, all of Chicago, Ill., for
plaintiffs.

Dwight H. Green, of Chicago, Ill., P. H.
Jackson, Lee Cressman, and J. J. Abt, of
Chicago, Ill., for defendants.

BARNES, District Judge.

This cause comes on to be heard upon the
motion of the plaintiffs and intervening pe-
titioners for an injunction restraining the
enforcement as against them of the "License
for Milk—Chicago Sales Area, as Amend-
ed," and on the motion of the cross-plaintiffs
for an injunction against the plaintiffs and
intervening petitioners restraining the viola-
tion of said license.

One question before the court concerns it-
self with the delegation of powers by the
Congress to administrative officers. The oth-
er question is: Is the action of the Secre-
tary of Agriculture, in issuing the license in
question, found within the powers granted
to the Federal Congress in the commerce
clause of the Constitution? Closely related
to this second question is the question: Does
the license impinge upon the powers re-
served to the states by the Tenth Amendment
to the Constitution?

The first question, that relating to the
delegation of legislative power, was not con-
sidered at length upon the oral arguments,
presumably because of the court's expres-
sions in the case of U. S. v. Suburban Mo-
tor Service Corporation (D. C.) 5 F. Supp.
798. The question is an important one. Leg-
islative power may, of course, be delegated to
administrative officers if the Congress makes
a sufficient statement of its policy for the
guidance and control of those officers and for
the information of those to be affected by the
action of the administrative officers. The
general subject of the Agricultural Adjust-
ment Act (7 USCA §§ 601–619) is agricul-
tural commodities prices, and it would seem
that one ought, after investigation, to be able
to say what the law of the United States is
on the subject at a given moment and, with
reasonable certainty, what, barring action by
the Congress, it is going to be in the future.
A person who contemplates the purchase of a
dairy farm or a herd of milk cows ought to
be able to determine, with reasonable certain-
ty, what laws of the United States or rules
and regulations made in pursuance of such
laws, barring action by Congress, will regu-
late or prevent the sale of the milk, cream,
and butter he proposes to produce. The poli-
cy of Congress is stated in the Agricultural
Adjustment Act in general language. On be-
half of the plaintiffs and intervening peti-
tioners and cross-defendants it is contended
that the language is so general that no man
can tell what can be done under the act, if
valid, or when it will be done. That there is
some force in their contention that no one
can tell when action will be taken must be
conceded when it is observed that the amend-
ed license in question in this case was exe-
cuted and promulgated on May 31, 1934, to
be effective "on and after 12:01 A. M. East-
ern Standard Time, June 1, 1934."

However, courts have uniformly been
loath to declare acts of Congress unconstitu-

tional because of the delegation of legislative power, and this court feels that it should not hold the act invalid on that ground.

The question as to whether or not the action taken by the Secretary of Agriculture, in issuing the license in question, is within the grant of power to the Federal Congress found in the commerce clause of the Constitution, was argued by counsel for the Agricultural Adjustment Administration with ability, and logically and persuasively. The difficulty in which the court found itself was that when it went out to the end of the doctrine of delegation of legislative power and then proceeded with counsel in their argument along the doctrine of the power of Congress to regulate interstate commerce, the court came to a point where it felt that it had no solid ground upon which to stand, though it seemed to have come to the point where it found itself logically and without wandering into bypaths. This feeling led the court to consider with care the question as to whether or not the power which has been exercised by the Secretary is within the grant to Congress under the commerce clause. Congress itself, so far as the issuing of licenses is concerned, tried to stay within this grant of power, since it provided, in section 8 of the Agricultural Adjustment Act (7 USCA § 608), that: "The Secretary of Agriculture shall have power * * * to issue licenses permitting processors, associations of producers, and others to engage in the handling, *in the current of interstate or foreign commerce,* of any agricultural commodity or product thereof, or any competing commodity or product thereof."

It is said by the Government that 40 per cent. of the milk which comes into the Chicago sales area is produced in states other than Illinois, and that it is impossible to control the distribution in the Chicago sales area of milk produced outside of Illinois unless the distribution of all of the milk coming into that area is controlled. The plaintiffs and intervening petitioners and cross-defendants, on their part, say that all of the milk which they buy and sell is produced in Illinois, and that it is purchased by them there and sold there. That this is the fact is not seriously disputed by the counsel for the Agricultural Adjustment Administration, though there is an affidavit on file which indicates that a part of the milk sold by one or more of the plaintiffs or intervening petitioners and cross-defendants is produced outside of the state of Illinois. But when the court examines the amended license in question in this case, it seems to the court that all of these facts are immaterial.

The amended license has three principal purposes, and no others. The first principal purpose is to fix the minimum price at which producers of milk may sell their product. If it be said that the purpose of the license is not to fix the price at which producers may sell their product but is to fix the price which distributers must pay, the answer is that, while the "License for Milk—Chicago Sales Area, as Amended," is a very complicated document, covering nineteen typewritten pages, and a considerable portion of those nineteen pages relate to price and the determination thereof, yet the price to be paid to any person other than a producer is, so far as the court can discover, mentioned but once, and then in paragraph No. 12 of section A, of Exhibit A, where the price which a distributer must pay to a distributer for milk and cream for class II use is mentioned and fixed, but even here the purpose carries back to production. The purpose of the paragraph is apparently to give a "two cents per pound of butter fat" advantage to the producer over the distributer who may have class II milk for sale. The affidavit of E. W. Gaumnitz, Economic Adviser to the Dairy Section of the Agricultural Adjustment Administration, states in respect of paragraph 12: "This provision is for the purpose of aiding the administration and enforcement of the Class II price to producers."

The second principal purpose of the license is to limit the production of milk by producers thereof by means of assigning to them so-called "bases," and the third principal purpose is to charge the cost of administration under the license to the producers by requiring the distributer to hold back from the producer 1 cent per hundredweight of milk in the case of producers who are members of the Pure Milk Association (an association of producers) and 4 cents per hundredweight in the case of producers who are not members of the Pure Milk Association. All other purposes to be found in the license are merely incidental to these three principal purposes. In other words, as it seems to the court, the distributer of milk is, by means of the license, made the agency of the Government for the regulation of the production of milk.

It seems clear that the production of milk is not "interstate commerce," and the court's best judgment is that the production of milk does not occur in the "current of interstate commerce," and that it does not "affect interstate commerce" in the sense that those

clauses have heretofore been used in the cases. The "License for Milk—Chicago Sales Area, as Amended," in question in this case, seems to the court to be an attempt by the Federal Government to use milk distributers for the purpose of doing what, under the Commerce Clause of the Constitution, the Federal Government has no power to do, and what, under the Tenth Amendment of the Constitution, is reserved for action by the states or the people.

The motion of the plaintiffs and intervening petitioners for an injunction will be granted; that of the cross-plaintiffs·for an injunction will be denied.

Counsel may prepare, and on due notice present, a draft of an appropriate order.