**ROYAL FARMS DAIRY, Inc., et al. v. WALLACE, Secretary of Agriculture, et al.**

No. 2265.

District Court, D. Maryland.

Nov. 16, 1934.

Charles G. Page and· George M. White, both of Baltimore, Md., for complainants.

Mac Asbill, Sp. Asst. to Atty. Gen., and Bernard J. Flynn, U. S. Atty., and C. Ross McKenrick, Asst. U. S. Atty., both of Baltimore, Md., for the United States.

Wm. L. Marbury, Jr., of Baltimore, Md. (Marbury, Gosnell & Williams, of Baltimore, Md.), for defendants.

CHESNUT, District Judge.

The question in this case is whether the "license for milk—Baltimore Sales Area" issued by the Secretary of Agriculture under the Agricultural Adjustment Act of Congress, effective May 12, 1933 (USCA, title 7, § 608 (3), is valid and applicable to the plaintiff, a Maryland corporation, which is a distributor of milk in the Baltimore Area. The defendants are the Secretary of Agriculture and certain individual citizens of Maryland, who constituted the "Adjustment Fund Committee" provided for in the license acting in some measure as local representatives of the Secretary.

The pleadings in the case have become very numerous but for the purposes of this opinion they may be succinctly summarized by saying that the plaintiff is seeking an injunction against the defendants and particularly against the Secretary, to enjoin the enforcement of the provisions of the license against it; while the defendants by counterclaims or cross-bills are seeking affirmatively to specifically enforce the license provisions against the plaintiff. The original bill was filed by the plaintiff on May 7th, 1934, and a preliminary injunction was then sought. The local defendants who were summoned moved to dismiss the bill on procedural grounds based largely on the consideration that at that time the Secretary of Agriculture had not effectively been made a party to the suit. The injunction was refused but the bill was retained. See (D. C.) 7 F. Supp. 560. Subsequently the Secretary was summoned while in Maryland and thereafter appeared and filed an answer in the case. The original license which by its terms was made effective September 29, 1933, was subsequently superseded by a new license making substantial changes which took effect August 1, 1934. This led to a supplemental bill filed by the plaintiffs without objection by the defendants and cross-bills thereafter were filed by the defendants. The case has now been submitted for final decision after hearing on the facts and arguments of counsel.

In its most general aspect the license imposes on the plaintiff the obligation to conduct its business in accordance with a highly

complex co-operative marketing plan for the purchase and sale of milk, and the most conspicuous feature of the plan is the requirement that the plaintiff shall pay a fixed minimum price for milk purchased, determined by a so-called "three-price schedule." The plaintiff has admittedly not complied with nor in any way assented to the license.

The plaintiff's principal contentions are (1) that the license is invalid because the Agricultural Adjustment Act (USCA, title 7, §§ 601 to 619) is unconstitutional for various reasons; and (2) that if the Act is generally constitutional the license issued by the Secretary exceeds the scope of his authority under section 608 (3) as properly construed; and (3) even if the license is valid as to milk dealers engaged in interstate commerce, it is inapplicable to the plaintiff which is not engaged in interstate commerce. I will consider these contentions in their inverse order.

Section 608 (3) reads as follows: "(3) *Licensing processors; revocation of licenses; penalty for handling without license.* To issue licenses permitting processors, associations of producers, and others to engage in the handling, in the current of interstate or foreign commerce, of any agricultural commodity or product thereof, or any competing commodity or product thereof. Such licenses shall be subject to such terms and conditions, not in conflict with existing Acts of Congress or regulations pursuant thereto, as may be necessary to eliminate unfair practices or charges that prevent or tend to prevent the effectuation of the declared policy and the restoration or normal economic conditions in the marketing of such commodities or products and the financing thereof. The Secretary of Agriculture may suspend or revoke any such license, after due notice and opportunity for hearing, for violations of the terms or conditions thereof. Any order of the Secretary suspending or revoking any such license shall be final if in accordance with law. Any such person engaged in such handling without a license as required by the Secretary under this section shall be subject to a fine of not more than $1,000 for each day during which the violation continues."

It will be noted that the authority of the Secretary of Agriculture to issue licenses is limited to those persons who are engaged "in the handling, in the current of interstate or foreign commerce, of any agricultural commodity or product thereof, or any competing commodity or product thereof." It is perfectly clear on the facts that the plaintiff is not engaged in handling milk in interstate or foreign commerce. The plaintiff buys its milk exclusively from Maryland dairy farmers who produce their milk from dairy herds in Maryland within the Baltimore Sales Area; the milk is delivered to the plaintiff in Baltimore and distributed and sold by it to consumers, chiefly householders, in Baltimore and the immediate vicinity. The plaintiff does not deal in milk or any product of milk shipped into or out of the state of Maryland. The plaintiff's business is, therefore, typically intrastate and not interstate commerce. Nevertheless the defendants contend that the plaintiff's business is subject to regulation under the license for several reasons.

First, it is said that the plaintiff's milk distribution is handled in "the current or stream of interstate commerce" and it is pointed out that the license contains the recital that "the Secretary finds that the marketing of milk for distribution in the Baltimore Sales Area and the distribution thereof are entirely in the current of interstate commerce because the said marketing and distribution are partly interstate and partly intrastate commerce and so inextricably intermingled that said interstate commerce portion cannot be effectively regulated or licensed without licensing that portion which is intrastate commerce." The evidence on which the finding was based has not been specifically stated but presumably is to be found in the testimony in the case offered on behalf of the defendants. The finding of the Secretary is, of course, not conclusive because the question is clearly one for final judicial determination. The facts developed in this case in my opinion do not support the finding. So far as the plaintiff's business is concerned, it is not controverted that it handles exclusively Maryland produced milk, all of which is finally sold to consumers in Maryland and at no time in any way physically intermingled with milk brought into Maryland from other states. The defendant's position seems to be that the plaintiff's business may be regulated by Congress as interstate commerce because some other distributors in the Baltimore Sales Area do purchase milk and agricultural products manufactured from milk transported in interstate commerce from other states which thus come into competition in the sale in the Baltimore Area with the plaintiff's milk; and further that some part of the fluid milk so imported by other distributors is manufactured into butter, cheese, ice cream and other products manufactured from milk, and in turn some part of the manufactured product is shipped from Maryland into other states; and also a considerable quantity of butter,

cheese and other products manufactured from milk are shipped into Maryland from other states. Thus it is said that there is a constant stream of interstate commerce into and out of Maryland in products manufactured from milk. On the facts I find that for some time prior to July 1, 1934, a small percentage of milk consumed as whole milk or fluid milk or cream in the Baltimore Area was originally produced in the southern part of Pennsylvania within the fifty mile area from Baltimore, but since July 1st, the amount of fluid milk and cream coming to Baltimore from Pennsylvania is practically negligible. Butter, cheese and other manufactured products coming from outside the state constitute a substantial portion of such products consumed in Maryland and it is also true that a substantial portion of milk products manufactured in Maryland are shipped out of the state. But so far as the plaintiff is concerned, it is clearly established that it does not deal at all in butter, cheese, ice cream and other products manufactured from milk but is engaged solely in the purchase and distribution of fluid milk and cream. I find therefore that the plaintiff's business is purely intrastate and is not in any way in the current or stream of interstate commerce.

It will be noted that the Act in terms authorizes the licensing of persons engaged in handling agricultural commodities "or any competing commodity or product thereof," and in one sense it might be argued that to the extent that fluid milk and cream are imported from other states and sold in the Baltimore Area the plaintiff's business could be said to be the handling of a competing commodity. But it is unnecessary to pursue this theory because counsel for the Government as well as for the plaintiff agree that the phrase in the Act "competing commodity or product thereof" does not mean milk handled in intrastate commerce as competing with milk transported in interstate commerce; but that the phrase has reference to such commodities as oleomargarine (assumed not to be an agricultural commodity), as a sales competitor of butter, which is an agricultural commodity.

■ Another contention made by the defendants is that if plaintiff's milk handling is not in the current or stream of interstate commerce, nevertheless it is within the interstate commerce powers of Congress because it constitutes a burden on interstate commerce. The plaintiff immediately answers that section 608 (3) does not authorize licensing intrastate business because it burdens or affects interstate commerce, and calls attention to

the fact that when the Agricultural Adjustment Act was amended in many parts at the last session of Congress, an amendment was also proposed to broaden the language of subsection (3) to expressly cover this contention of the defendants, but that the amendment was not passed, apparently never having been brought to a vote in Congress. The amendment as proposed was that licenses could be issued by the Secretary to regulate those "engaging in the handling of any agricultural commodity or product thereof, or any competing commodity or product thereof, in the current of or in competition with, or so as to burden, obstruct or in any way affect interstate or foreign commerce." Subsection (2) providing for voluntary marketing agreements was in fact so amended as of April 7, 1934, 48 Stat. 528, 7 USCA § 608 (2). But the defendants say that the proposed amendment was merely for greater clarification and to make express what is clearly implied in subsection (3) as it now stands; and reference is made to Senate Report No. 1120, May 10, 1934, to that effect. Assuming without deciding, that this position is tenable, in my opinion it becomes immaterial so far as this case is concerned because there is no factual basis here which would warrant the conclusion that the plaintiff's business activities constitute such a *direct* burden on or obstruction of interstate commerce as, from any of the decisions of the Supreme Court, would justify congressional regulation of the plaintiff's typically intrastate commerce activities.

■ The defendants advance still another theory, to justify regulation of the plaintiff's business, which sets up a still broader conception of the interstate commerce power of Congress, and most of the defendants' testimony in this case relates to this theory. It is developed principally in the testimony of Dr. Gaumnitz, an economist in the Department of Agriculture. It is said that statistical data show a very close relationship between prevailing prices for fluid milk and its manufactured products and that the plotted price curves for fluid milk and its content, butter fat, largely parallel each other over a period of years. The deduction therefrom is that conditions which affect the price of milk in turn similarly affect the price of manufactured products of milk; and that while the geographical area within which fluid milk may be transported from the place of production to the place of consumption is by virtue of its perishable nature quite limited, nevertheless butter, cheese and other manufactured derivatives from milk have a national market

and tend to conform to a national price structure. From which is again deduced the conclusion that conditions affecting the price of milk in one locality, as for instance the Baltimore Sales Area, will also tend to affect the price of products manufactured from milk which are transported into Maryland largely from several of the mid-western states. Thus the conclusion is finally deduced that milk prices in the Baltimore Area may affect the price for butter, cheese and similar milk products customarily transported in interstate commerce and by affecting the price will affect the flow of these articles in interstate commerce.

But the contention requires closer analysis in relation to the facts. The objective is to *increase* the volume of interstate commerce in milk products flowing into Maryland from other states. The means adopted in the license is the artificial increase in price paid to the local producer for fluid milk which, as will be seen from the discussion later on another point, will very probably result in an increase of the retail price paid by the consumer, and very likely diminish the amount of consumption of fluid milk, with the result that the surplus of milk produced locally, which must be manufactured into milk products, will be increased, with the final result that the local market for milk products will have less capacity to absorb such products from other states, and the increased local supply will also tend to lower prices, in the operation of the well known law of supply and demand, which will again tend to diminish and not increase the flow of interstate commerce in these commodities. The theory based on a supposed national price level for milk products, affected by the price for fluid milk, seems also to ignore the fact that the prices fixed (in some 41 licenses for different urban areas) for fluid milk, vary greatly with the particular localities. Looking at interstate commerce from the angle as to what constitutes a burden thereon, it would seem that artificial price fixing tending to affect the free flow of such commerce would be the burden, rather than free competition, and such has been the philosophy underlying the Anti-Trust Act, and the basis of judicial decisions which strike down state legislation affecting the free flow of interstate commerce. This is not to say that Congress lacks the power to reverse the economic policy of the Sherman Law as to interstate commerce; but only that an open price market cannot itself be regarded as a burden on interstate commerce to justify price regulation to relieve the supposed burden. But whatever may be the merits of these economic considerations, the controlling legal question is the one of constitutional power, where it is necessary to draw the line of demarcation between state and federal power.

If the Government's contention here made as to the scope of the interstate commerce power is sound it can equally be applied to all agricultural commodities produced and sold in Maryland which in any way enter into competition with similar products produced in other states and transported into Maryland. Thus wheat, corn and poultry and eggs produced and sold in Maryland could be so licensed and regulated, and indeed the logical development of the doctrine would permit congressional regulation of practically all commerce in the state. This is clearly inconsistent with the fundamental conception of the nature of our government under the Constitution in the line of demarcation between state and federal powers. The Constitution does not grant to Congress the power to regulate all commerce but only (section 8, cl. 3) "to regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes"; and clause 18 "to make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof;" but subject to the Tenth Amendment which provides "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." Numerous decisions of the Supreme Court have firmly established the doctrine of our constitutional law that Congress has no power to interfere with or regulate the purely internal commerce of the states. Kidd v. Pearson, 128 U. S. 1, 22, 9 S. Ct. 6, 32 L. Ed. 346; Hammer v. Dagenhart, 247 U. S. 251, 275, 38 S. Ct. 529, 62 L. Ed. 1101, 3 A. L. R. 649, Ann. Cas. 1918E, 724; and Heisler v. Thomas Colliery Co., 260 U. S. 245, 259, 43 S. Ct. 83, 67 L. Ed. 237, are particularly in point.

More specifically, it has recently been held by the Supreme Court in Nebbia v. New York, 291 U. S. 502, 54 S. Ct. 505, 78 L. Ed. 940, 89 A. L. R. 1469, that the state has under its police power full authority to regulate its internal commerce in milk even to the extent of fixing prices for its sale. See also Hegeman Farms Corporation v. Baldwin (D. C.) 6 F. Supp. 297, affirmed by the Supreme

Court November 5, 1934, 55 S. Ct. 7, 79 L. Ed. ——. And Maryland has extensively regulated the milk business within the state both by general laws (see Bagby's Maryland Code, art. 27, §§ 278–282, and article 58, §§ 28, 40) and also by local legislation (see Ordinances of Baltimore City—Baltimore City Code, 1927, art. 16, §§ 52–81); although so far the legislation has not included price fixing, as has been done in New York, New Jersey, Pennsylvania and some other states. There are decisions to the effect that in the absence of congressional legislation the state may validly pass laws in certain instances which may affect interstate commerce but such state laws are superseded by subsequent congressional legislation (Minnesota Rate Cases, 230 U. S. 352, 398, 33 S. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18; Sproles v. Binford, 286 U. S. 374, 390, 52 S. Ct. 581, 76 L. Ed. 1167; Mintz v. Baldwin, 289 U. S. 346, 350, 53 S. Ct. 611, 77 L. Ed. 1245); but so far as I am aware, there is no judicial authority for the proposition that Congress may validly regulate purely intrastate commerce on the ground that the state has not yet covered the field. It is clear, of course, that within the scope of the interstate commerce clause the power of Congress is supreme and plenary, but it may not go beyond this into the field of purely intrastate commerce which is reserved by the Constitution for the exercise of the important powers of local self-government. The line of demarcation between the extent of the interstate commerce power, which of course includes the sale in the original package of importation into the state, and the intrastate commerce as specifically applied to the milk business in New York where the sale price is fixed, is very clearly shown in the recent opinion of Circuit Judge Learned Hand, speaking for a three-judge court in Seelig v. Baldwin (D. C.) 7 F. Supp. 776, very recently affirmed per curiam by the Supreme Court, 55 S. Ct. 120, 79 L. Ed. ——.

The broad conception of the interstate commerce clause here contended for by the defendants is substantially the same that was urged on behalf of the Government in a recent case in this court relating to intrastate commerce in gasoline arising in the course of administration of the National Industrial Recovery Act (48 Stat. 195). United States v. Mills (D. C.) 7 F. Supp. 547. The arguments and authorities bearing upon the subject were there quite extensively considered and the cases reviewed at length. The argument here, though somewhat different in form, substantially rests upon the same considerations and authorities which were there reviewed and considered. The conclusion reached was against the Government's contention. It seems unnecessary to again discuss the subject in detail especially as the application of the proposition to the milk business has recently been very thoroughly considered in numerous district court cases. In some cases arising shortly after the passage of the Agricultural Adjustment Act, on motions for preliminary injunction, the views here contended for by the Government were sustained. Economy Dairy Co. v. Wallace (Milton-Beck v. Wallace) (Sup. D. C.) 61 Wash. Law Rep. 633; United States v. Shissler (D. C. Ill.) 7 F. Supp. 123; United States v. Calistan Packers (D. C. Cal.) 4 F. Supp. 660 (dealing with the cling peach industry under a somewhat different factual situation). But in a series of five cases recently decided under factual situations quite parallel to that here involved, although disposed of mostly on motions for preliminary injunction, the several federal district courts have uniformly held that the license was not applicable to the local milk dealer because engaged purely in intrastate commerce. Edgewater Dairy Co. v. Wallace (D. C. N. D. Ill.) 7 F. Supp. 121; Hill v. Darger (D. C. Cal.) 8 F. Supp. 189, decided Sept. 7, 1934; United States v. Greenwood Dairy Farms (D. C. Ind.) 8 F. Supp. 398, decided Sept. 27, 1934; Douglas v. Wallace (D. C. Okl. October 17, 1934) 8 F. Supp. 379; and United States v. Neuendorf (D. C. Iowa, October 19, 1934) 8 F. Supp. 403. See also recent decisions to the same effect in cases arising under the National Recovery Act; Purvis v. Bazemore (D. C.) 5 F. Supp. 230; Hart Coal Corp. v. Sparks (D. C.) 7 F. Supp. 16; United States v. Gearhart (D. C.) 7 F. Supp. 712; Irma Hat Co. v. Local Retail Code Authority (D. C.) 7 F. Supp. 687.

■ These considerations make necessary the finding of fact and the conclusion of law that the milk license in this case may not validly be applied to the plaintiff corporation because it is engaged exclusively in intrastate commerce.

As this conclusion is in itself sufficient to control the final disposition of the case, it is perhaps unnecessary to discuss other questions. But as the case is in the nature of a test case for this District, and is, I believe, the first (with possibly one exception) of these milk license cases which has been submitted after final hearing, as contrasted with disposition on application for preliminary injunction, and as much of the testimony in the case and arguments of counsel have related

to the question whether the license is authorized by the statute, it seems appropriate to express the views of the court on this latter question.

The language is "such licenses shall be subject to *such terms and conditions * * * as may be necessary to eliminate unfair practices or charges* that prevent or tend to prevent the effectuation of the declared policy and the restoration of normal conditions in the marketing of such products or the financing thereof." The language imports the negative rather than the positive with respect to the terms and conditions of the license. They are authorized only to the extent that they may be necessary "to eliminate unfair practices or charges." Can the license in this case. be brought within the range of this phrase? The answer compels an analysis of its main provisions.

The license issued is not an individual one to the plaintiff but is in the form of a blanket license issued to the trade in general. It consists of 20 closely printed pages. It has the form of positive legislation, or at least of regulations issued by the Secretary, rather than a simple license to an individual. The primary purpose of the license is to raise the prices received by farmers for milk. The principal provision to accomplish this is the fixation of prices to be paid by the milk distributor to the dairy farmers. But in addition there are other very detailed provisions which purport to restrict the classes of people with whom the distributor may deal and to require him to give bond under certain conditions to conduct his business and to account for all milk sold by him in certain prescribed ways, and make detailed reports of business done to a Market Administrator. In short, it may be said that this license effects a very meticulous regulation of the distributors' business. In its most general aspect it requires milk producers and distributors to join in a co-operative association in the handling of milk. At the present time the plaintiff's business practice is to bargain directly with farmers, about 80 in number, from whom it purchases its milk directly. It pays them a flat price of 20 cents a gallon for the milk. It is delivered to it in Baltimore, pasteurized, bottled, and then delivered to its customers; and this constitutes the whole of its business activities. It pays the farmers directly the price agreed upon. As contrasted with this simple business practice the provisions of the license require it to deal only with persons who are themselves observing the terms of the license and it is required to

pay not a flat price which it has agreed upon with the farmers from whom it buys but to pay them directly a part of the total price and to pay another part into a so-called "Adjustment Fund" which, in accordance with the scheme set up in the license, is ultimately divided between other milk distributors. The plaintiff is thus restricted in its freedom and liberty of contract as to the persons with whom it desires to deal and the basis of payment for what it buys, and incidentally is prevented from engaging in business at all unless it gives bond or otherwise satisfies the Market Administrator of its solvency and ability to make payments into the Adjustment Fund.

To understand the reasons for the elaborate and highly complex license provisions, some little historical statement is necessary. Prior to 1918 the general practice in the Baltimore Sales Area in the marketing of milk was similar to the plaintiff's present practice. In that year there was formed an association of dairy farmers for the purpose of marketing milk under a co-operative plan which has been called the "Base and Surplus Adjustment Fund Plan." The general purpose of the arrangement was to provide for the marketing of so-called excess or surplus milk in such a way that it would not be thrown on the market and unduly depress the retail sale price of fluid milk and cream. This so-called excess consisted of milk shipped into the Baltimore Area over and above the amount necessary for consumption as fluid milk and cream, which had to be converted or sold for purposes of manufacture into ice cream, butter, cheese and other products of milk. To this end the Maryland State Dairymen's Association was authorized by the farmer producers to act as their agent in marketing their milk, and the general plan was to sell as much milk as could be bottled and sold as fluid milk or cream at a fairly uniform retail price, and to sell the balance or surplus for manufactured products. This surplus realized a price materially less than the price for fluid milk and cream. The total receipts from sales for all purposes were then pooled and distributed by the Dairymen's Association among the farmers in accordance with the so-called base and surplus plan under which the farmer was paid at a certain rate per gallon for a certain proportion of the whole quantity of milk produced by him and at a smaller rate for another proportion of his output, and at a still smaller rate for the balance. Allotments of these respective proportions of total output were made by the Dairymen's Association to each of their farm-

er members, and the basis of the allottment in general was determined by the amount of milk which for a period of years had been produced by the farmers respectively in the fall season of the year, which was much less than was customarily produced by them in the spring of the year. The public consumption of fluid milk and cream is relatively stable in amount for all seasons of the year (although it varies slightly between the winter and summer). The normal milk production is at a minimum in the fall and a maximum in the spring. The farmer was thus encouraged to increase his production in the fall and discouraged to greatly increase it in the spring, the idea being, so far as possible, to keep the monthly output fairly level. The so-called first basis of the farmer, therefore, tended to approximate the quantity of his output in the fall and the excess over this amount was treated as surplus. It was provided that he should be paid a higher rate for his maximum output in the fall and a lower rate for his excess production in the spring. Later, however, classification was made whereby the farmer was given an allotted base of amount for which he would be paid on the highest basis as Class I; for another amount of his production on a lower rate of payment as Class II, and for a still lower base for the remainder of his output as Class III. Or, as it may be otherwise expressed, the farmers were allotted a first delivery base, and a second delivery base and a third delivery base.

This co-operative marketing arrangement has continued to exist from 1918 to the present time, and now 91% of all milk produced in the Baltimore Area is marketed through the Dairymen's Association. The number of Maryland farmers belonging to the Association is about 4,000. The effect has been a fairly stabilized price for retail sales of milk and cream during the period and the prices realized by the farmers who sell their milk in the Baltimore Area are relatively higher than in many other places, particularly higher than in Philadelphia, and, for cream at least, higher than in New York. The effectiveness of the plant has been largely aided by the fact that a large majority in amount of the total milk marketed has been distributed by a few large distributors of whom the Fairfield Western Maryland Dairy is much the largest, handling about 60% of the total amount marketed. The producer farmers in the Maryland Area who are not members of the Association make their contracts for the sale of milk directly with distributors (about ten in number) who are called Independents, in-

cluding the Royal Farms Dairy, Inc., the plaintiff.

Shortly after the passage of the Agricultural Adjustment Act, the Maryland State Dairymen's Association at a hearing held by or for the Secretary of Agriculture, submitted a proposed marketing agreement along the lines of its plan of operations above mentioned. Section 608 (2), 7 USCA, section 8 (2) of the Act, provides for marketing agreements, the language being, in part (as amended by the Act of April 7, 1934, 48 Stat. 528, § 7), as follows: "After due notice and opportunity for hearing, to enter into marketing agreements with processors, producers, associations of producers, and others engaged in the handling of any agricultural commodity or product thereof, in the current of or in competition with, or so as to burden, obstruct, or in any way affect, interstate or foreign commerce."

This section, of course, contemplates voluntary action and would not be effective against those who did not voluntarily enter into the agreement. The Secretary then entered into such a marketing agreement with those who were willing to do so, representing about 75% in interest. But it still left the problem of the minority dissenters and to bind them the Secretary issued license No. 6 under section 608 (3) effective as of September 29, 1933, which in its fundamental features is not essentially different from the marketing agreement and is on the same general plan under which the Maryland State Dairymen's Association operated. The prices therein fixed for the three classes of milk were respectively 22½¢ per gallon; 17¢ per gallon and a lower figure for the Class III milk. Later, effective August 1, 1934, Acting Secretary Tugwell superseded license No. 6 (for the future) by license No. 80 which in general structure follows the form of the former license but materially increased the price to be paid by distributors to farmers; and also replaced the so-called Adjustment Fund Committee under license No. 6 by an official called a Market Administrator, who was to have practically the same functions, powers and duties as the former Adjustment Fund Committee.

While the license has many meticulous provisions for the conduct of the distributors' business, its most conspicuous and objectionable feature to the plaintiff and other independent dealers, is the price fixation which is called a three-price plan by which the distributor is required to pay for all milk handled by him at a fixed price which varies for

several classes of milk, determined by the *use* to which the milk is put by the distributor or the purpose for which it is sold. The classification is as follows: Class I milk includes "all milk sold or ·distributed by distributors for consumption as whole milk in the Baltimore Sales Area"; that is to say, bottled milk sold to consumers. Class II milk covers in substance milk used for the production of cream, cottage cheese and cream buttermilk; and also all milk received by the distributor not otherwise definitely accounted for as Class I or Class III milk. Class III milk means "the quantity of milk received, purchased, sold, used or distributed by distributors in excess of Class I and Class II milk"; or, in other words, the excess milk above referred to which is manufactured into milk products such as butter and cheese. The requirements of the license as to the payment for milk by the plaintiff as a distributor are peculiar. On or before the 5th day of each month the distributor must report to the Market Administrator all quantities of milk received from producers, classified with respect to the producers' first, second and third delivery basis; the quantity of milk sold, used or distributed by them as Class I and Class II and Class III milk respectively; and such other information as the Market Administrator may request for the purposes of the license. The reports are to cover milk handled during the preceding calendar month. On or before the 15th day of each month, for the prior month, distributors are to pay to their producers (a) at the Class I price for the quantity of milk delivered by each producer represented by such producers' first delivery base; (b) at the Class II price for quantities of milk represented by such producers' second delivery base; (c) for quantities of milk delivered by such producers in excess of such producers' first and second delivery base, not the Class III price fixed in the license, but a price determined by the Market Administrator from reports submitted by *all* distributors, by dividing the total number of gallons of Class III milk sold or used by all into the gross actual receipts therefrom. In addition to the payments made by the plaintiff directly to its producers, it must also pay into the Adjustment Fund the difference between the total sum which it is obliged to pay for the milk received and distributed by it at the rates specified in the license, and the *smaller* amount which it has paid directly to the producers. The fund is adjusted and periodically divided among the other distributors, in the manner prescribed in the license, as simply illustrated by defendants' Exhibits Nos. 26–

29. The general object is to equitably compensate those producers who handle relatively large quantities of the Class III or surplus milk for which the lowest price is received in the market. The plaintiff does not share in this fund because it handles no surplus milk.

During the period October 1, 1933 to July 31, 1934, the plaintiff purchased its milk from farmers at a flat rate of 19¢ per gallon. By plaintiff's Exhibit No. 12, it appears that if it had complied with the provisions of No. 6 license in force during that period, the payment that it would have been required to make to the so-called Adjustment Fund would have been $11,186.81; and from the same Exhibit for the same period the plaintiff's producer farmers would have received in payment from the plaintiff as purchaser $7,506.87 *less* than the plaintiff actually paid them.

■ Plaintiff's counsel contends that the license is not within the authorization of the Act for a number of reasons. Some of the reasons are more directly referable to constitutional limitations than to statutory interpretation, but in view of the well established doctrine that statutes should be construed so as to be within rather than without constitutional power, the objections may be fairly considered under the general heading now being discussed.

■ The first point to be considered is what is the fair and reasonable scope of the phrase "to eliminate unfair practices and charges." On first impression, the phrase, in its context, would seem to import the general kind of regulation illustrated by the case of Tagg Bros. v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. Ed. 524, arising under the Packers and Stockyards Act (7 USCA §§ 201–217). It is pointed out that the phrase contemplates an elimination of existing evils in the form of practices or charges rather than the affirmative imposition of the scheme of detailed regulation imposed by the license. And it is objected that the plaintiff is forced against its will to conduct its business under a closely regulated co-operative marketing plan involving mutuality of interests with which the plaintiff is unwilling to voluntarily associate itself. It is said this is in effect an attempt to exercise the police power which, if within the scope of state legislation, goes to an extent not heretofore exercised, and is far beyond the scope of regulation which would merely eliminate unfair practices or charges. It is said also that the phrase "unfair practices or charges" is so vague that it affords no reasonable standard for application by the

984

Secretary in determining what the terms and provisions of the license shall be. Doubtless the phrase must be interpreted in accordance with the major objectives of the Act, which, as defined in section 602 (7 USCA), are "(1) To establish and maintain such balance between the production and consumption of agricultural commodities, and such marketing conditions therefor, as will reestablish prices to farmers at a level that will give agricultural commodities a purchasing power with respect to articles that farmers buy, equivalent to the purchasing power of agricultural commodities in the base period. The base period in the case of all agricultural commodities except tobacco shall be the prewar period, August 1909–July 1914. * * * (2) To approach such equality of purchasing power by gradual correction of the present inequalities therein at as rapid a rate as is deemed feasible in view of the current consumptive demand in domestic and foreign markets. (3) To protect the consumers' interest by readjusting farm production at such level as will not increase the percentage of the consumers' retail expenditures for agricultural commodities, or products derived therefrom, which is returned to the farmer, above the percentage which was returned to the farmer in the prewar period, August 1909–July 1914."

It appears from other sections of the Act that these objectives are proposed to be accomplished in various ways: (1) By reduction of production; (2) consequent benefit payments to farmers; (3) marketing agreements; (4) a processing tax and (5) elimination of unfair practices or charges; and it is suggested that when the Act as a whole is envisaged it would be giving an entirely undue breadth to the license provision, "to eliminate unfair practices or charges," to extend it to a whole new affirmative scheme of regulation of a particular business. The reasonable application of the term "unfair" would seem to be committed in the first place to the Secretary of Agriculture and is perhaps not broader in legal concept than the prohibition of "unfair methods of competition" as used in the Federal Trade Commission Act (15 USCA §§ 41–51). So analogized it appears that ultimately the question in any particular case becomes a judicial one to be defined by "the gradual process of judicial inclusion and exclusion." See Federal Trade Commission v. Keppel, 291 U. S. 304 to 312, 54 S. Ct. 423, 78 L. Ed. 814. In judicially applying the phrase regard must be had of course to the context in which it appears and the declared policy of the Act must be borne in mind. In the field of legislation the subject matter is admittedly novel and perhaps calls for a broader application than has heretofore been applied to trade practices. But nevertheless it is said to be impossible to judicially declare that there is anything unfair in the plaintiff's trade practices of buying a common article of commerce from willing vendors at a price fairly arrived at by mutual agreement, and that there is no warrant in the history of the law for condemning such a simple bargain in the absence of validly fixed statutory prices.

The power of the Secretary to fix the price in the license is directly challenged by the plaintiff and it is pointed out that the Act does not in terms confer this power although elsewhere power is expressly given to the Secretary to fix the amount of the processing tax. But for the defendants it is said that the power to fix prices is given to the Secretary by necessary implication from the Act as a whole; and further that Congress has the power to fix prices of commodities transported to interstate commerce. Counsel have been unable to refer to any Act of Congress which has in fact done so (the National Industrial Recovery Act not being considered) unless the power of the Interstate Commerce Commission to prescribe reasonable transportation rates can be adopted as an analogy. Lemke v. Farmers' Grain Co., 258 U. S. 51, 42 S. Ct. 244, 66 L. Ed. 458, and Local 167 v. United States, 291 U. S. 293, 54 S. Ct. 396, 78 L. Ed. 804, are cited as establishing the proposition that Congress may fix prices in interstate commerce. It is at least doubtful that the citations support the contention. What was decided in the Lemke Case was that a state may not impose taxation on grain at the beginning of its interstate journey which amounts to a burden on interstate commerce, and the later case applied the same doctrine to activities which impede interstate commerce at the end of the journey. To the extent that the fixing of prices of commodities moved in interstate commerce may be reasonably necessary to protect the freedom of the movement, it would seem clear enough that Congress would have the power to fix such prices. But it is somewhat difficult to conceive a case in which fixing prices of the commodities themselves moved in interstate commerce would be deemed reasonably necessary as an incident of the exercise of the power to *regulate* interstate commerce therein. At least no such act has been called to my attention. It may also be suggested that assuming the existence of the power, it is of such an important nature and so vitally af-

fects the individual's general right of freedom of contract that if Congress had intended to give the power to the Secretary it would have been definitely expressed rather than left to uncertain implication by the use of such a general phrase as the "elimination of unfair charges."

■ The plaintiff also attacks the particular price fixing in the license as arbitrary and so excessive as applied to the plaintiff that if enforceable against it, its business will be destroyed. In this connection the plaintiff shows by credible testimony that for the six months' period of January to July, 1934, its business as actually conducted yielded a net profit of about $4,000; but if it had been obliged during that period to conform to the price requirements of license No. 6, its business would have been conducted at a loss. And if it now has to comply with the higher prices required by the present license No. 80, it will have to entirely discontinue its business which otherwise could only be conducted at a very substantial loss. The plaintiff's business is of substantial character with gross receipts of about $200,000 a year; the salaries paid to its officers are modest in amount ($2500 to the president), and there is no testimony to indicate inefficiency in management. Nevertheless if the price has been validly fixed by the Secretary acting under due authority, the plaintiff is remediless despite the effect on its business. Hegeman Farms Corp. v. Baldwin (D. C.) 6 F. Supp. 297, affirmed by the Supreme Court November 5, 1934, 55 S. Ct. 7, 79 L. Ed.——. But the testimony in the case indicates in effect that not only the plaintiff but practically all other milk distributors in the Baltimore Area will be unable to operate their business without loss, under the price schedule fixed in the new license unless the price to consumers can be increased, and it is speculative whether the consumptive demand and consumers' purchasing power for fluid milk and cream is sufficiently great at the present time to permit the marketing of milk at retail at a greater price than now prevails. None of the distributors are now complying with the increased price schedule of the new license. While the objectives of the Act are to increase the farmers' income (in reasonable relation to the consumers' purchasing power) without special reference to the distributor, as a practical matter it cannot be overlooked that the distributors' services are vitally necessary both to the farmer and the consumer and the fixation of a price at such a figure that distributors would have to discontinue business would defeat the purposes of the Act by making it substantially impossible for the farmer to market his product. While the fate of a particular distributor may be legally unimportant if the main objectives of the Act can be accomplished, the destruction of the whole distributing system for the Baltimore Area would be a public calamity which would engulf not only the consumer but the farmer also. It is, therefore, I think, fairly within the range of judicial inquiry in ascertaining whether the powers exercised by the Secretary are within the scope of the Act, to consider the relevant testimony as to the effect which the prices fixed in the license will apparently have on the business as a whole.

It is to be borne in mind that the purpose of the Act is to increase the purchasing power of the farmer "by gradual correction of the present inequalities therein at as rapid a rate as is deemed feasible in view of the current consumptive demand"; and to protect the consumers' interest by limiting the prices to the farmer in such a way that it "will not increase the percentage of consumers' retail expenditures for agricultural commodities * * * above the percentage which was returned to the farmer in the prewar period." The relevant facts established by the testimony in this connection are these. In 1909–1914, the farmer received payment for milk at the flat rate of approximately 18¢ per gallon, in the Baltimore Area, by the weight of the evidence. Dr. Gaumnitz testified that the statistical index figure at the present time for farmers' general commodity expenditures is 125 based on national figures which he thought would probably not be largely affected by local conditions. He concluded, therefore, that farmers' prices for milk should, if possible, be raised to a figure 25% above the prewar period. And he gave effect to the limitation in the interest of consumers by adopting the theory that if the price to the consumer was not raised disproportionately this provision of the Act in the interests of consumers would be gratified. It must be admitted that the limitation in the Act in the interests of consumers is difficult to apply even if the meaning of the Act is clear. But it is at least doubtful whether the interpretation given to the limitation by the witness is correct. The probable meaning of this provision in the Act would seem to be that the consumer would not be obliged to pay for agricultural products in greater proportion to general living expenses than he was obliged to pay in the prewar period. But as the present case does not directly present the

consumers' interest and as the testimony with regard thereto is far from full and complete, it seems difficult to reach a definite conclusion as to the effect of the prices in this case in relation to the consumers' purchasing power. Passing this, we revert to the facts of the case in their relation to the plaintiff.

As has already been stated, the price for Class I milk set up by the earlier license No. 6 was 22½¢ per gallon, (of four per cent. butterfat content). For Class II the rate was 17¢; and for Class III milk the price was to be determined by a formula which resulted in a variable price but may be stated for comparative illustration as 13¢ per gallon. In the later license now effective these prices were increased for Class I and Class II milk respectively, to 26¢ and 19¢ per gallon, and a small reduction was made in the price for Class III milk by an amendment. It is impossible to state an absolute comparison between the price per gallon for all milk prevailing in the prewar period with the present fixed price because in the former period the milk was not classified as it now is; but it is said to be deducible from the figures in the case that under license No. 6 the price received by the farmer was equivalent to 110% of the prewar prices; and it was the view of Dr. Gaumnitz that the further increase made by the new license is statistically within the permissible range of increase authorized by the Act.

The testimony in the case is convincing that the reasonable cost of distribution of milk at retail to the consumer, including pasteurization, bottling and delivery charges, is 19½¢ per gallon. In 1909–1914, the uniform retail price to household consumers was 9¢ a quart or 36¢ a gallon. The license No. 6 fixed the maximum (but no minimum) retail price for Class I milk to individual consumers at 11¢ per quart. The present license fixes no retail sales price by the distributors. But the prevailing price in the Baltimore market is still 11¢ per quart for Grade A milk. It is a simple mathematical computation that if the farmer is to be paid 26¢ a gallon for Class I milk and the distributing expense of 19½¢ per gallon is to be added thereto, the result is a total operating expense to the distributor of 45½¢ per gallon as against the present retail sales price of 44¢. There is further testimony to the effect that 2¢ a gallon profit is a not unreasonably high return to the distributor. It is obvious, therefore, that the farmers' price as fixed by the new license will drive the distributor out of business unless the price to the consumer is increased to 12¢ a quart, it

being impracticable to make a smaller increase than 1¢ a quart. But as already indicated it is at least doubtful that the increase if made will not be so far beyond the present consumptive demand and purchasing power that the quantity of fluid milk sold for consumption will be very much decreased. Or, in other words, it is speculative whether a 12¢ retail price can be maintained. From the standpoint of the consumer it represents an increase of 33⅓% over the prewar period. But in this connection it is fair to bear in mind that the quality of milk received by the consumer and possibly the delivery service is materially better than in the prewar period.

As already noted the present license differs from the former in that no retail price, either minimum or maximum, is fixed. This represents a departure in policy by the Secretary of Agriculture which is said to be attributable to the fact that the Secretary became convinced that generally the distributors' profits were unreasonably high; that is to say, that the margin between the price paid to the farmer and the retail sales price produced an excessive profit. However true this may be generally in other particular localities, it is not indicated by the testimony in this case for the Baltimore Area. The result of the change in policy is to require the distributor to buy his milk supply in a *protected* market and to sell it in a *free competitive* market. If unable by reason of competition to increase his retail sales price the smaller distributors are thus ground between the upper millstone of protection and the nether millstone of competition.

It is not within the province of the court to determine what is a reasonable price for the purchase or sale of milk at wholesale or retail. And of course the court may not concern itself with questions of economic policy. The figures that have been given and the discussion with relation thereto are stated for the purpose of obtaining a comprehensive view of the general operation and effect of the license with special reference to the question as to whether its provisions as a whole are justified by the general phrase "to eliminate unfair practices or charges."

Plaintiff's counsel also contend that the license is not within the authority of the Act because it is not designed to limit production but on the contrary has the tendency to increase production by arbitrarily raising prices and thus encouraging excess production over consumptive demand. Reference is made to the statistical table in the stipulation of facts which shows that the percentages of

surplus (Class III) milk handled by the Maryland State Dairymen's Association increased from 10% in 1922 to 72% in 1933, under the co-operative plan similar to the license. It is further said by plaintiff's counsel that the Act contemplates national uniformity in the restriction of production while the particular license is limited in its operation to a small local area, and other individual licenses with varying provisions and price structures similarly have been adopted for local areas only; and that all fluid milk which is sought to be regulated by licenses in particular urban areas constitutes approximately only 30% of the total output from all the dairy herds.

There are other objections to the license urged by the plaintiff such as its contention that it does not operate to control countrywide production and is designed to benefit a particular class of farmers only; and is substantially restricted in its operation and effect to farmers engaged in intrastate commerce rather than in interstate commerce; and is inconsistent with the declared policy of the Act to protect consumers; and that the artificial raise in price tends to decrease the amount of fluid milk consumed by the public and thus to react against the declared policy of the Act to increase the farmers' income. But these later considerations largely relate to policy rather than to constitutional or statutory power.

■ From this comprehensive review of the main features of the license plan, after considering its relation to the Act as a whole, and with special reference to the scope of the power delegated to the Secretary by subsection (3) as to what terms and provisions the license may properly include, I reach the conclusion that the license as formulated is not within the statutory power delegated to the Secretary. It is pertinent to observe that Senate Bill 3326, § 2, already referred to proposed to amend subsection (3) so that in describing the terms and provisions which the license might contain it would read as follows: "To issue licenses * * * to engage in such handling upon such terms and conditions as the Secretary of Agriculture may deem necessary to effectuate the declared policy of this Act." In Senate Report No. 1120 on this Bill, page 2, it is said (apparently with reference to this proposed change): "Certain language of the original section 8 (3) which might be construed as limiting in effect has been eliminated." It is obvious that the amendment, if it had been passed, would have materially increased the range of discretion of the Secretary in formulating the terms and provisions of the license. It also appears that the explanation given to the Senate Committee, in hearings on the Bill, by and on behalf of the Secretary, as to the purpose and scope of the license provision, was consistent with the restricted meaning of the expression "unfair practices and charges" rather than with the more expanded meaning now contended for by the defendants. (See Hearings before the Committee on Agriculture and Forestry, on H. R. 3835, March 17, 24, 25, 27 and 28, 1933, pp. 10-22, and 30.)

It becomes unnecessary to consider the question whether the Agricultural Adjustment Act is generally constitutional. It is understood the question is now pending in the Supreme Court. The milk business in the Baltimore Area as in other urban centers, is undoubtedly of vital importance to a large number of producer farmers and hundreds of thousands of consumers. It may seem regrettable that a test case of this character in which the facts and law have been so fully developed is not susceptible of other than negative action by the court with regard to the whole problem. But as observed, the court has no jurisdiction or function to determine what are reasonable prices for milk or to constructively outline a marketing plan which would be reasonable for all interests. The question as presented to the court is only one of legislative or constitutional power and the court's only function is to declare as a matter of law whether the license can validly be enforced against the plaintiff. And for the reasons that I have stated, the conclusion is that it may not be. While the court may not concern itself with questions of economic policy it is permissible to note that it appears from the testimony in this case that the form of co-operative industry in the handling of milk which has been in vogue here for the past 15 years, and embraces more than 90% of the producers of milk in the Area, has worked well for its participants, and has tended to prevent the wider variations in prices that have occurred in other localities, and apparently without undue prejudice to consumers. But co-operative plans are necessarily based on the individual assent of those affected, and may not be imposed on those who dissent except through valid legislation. To what extent the state should interfere and by the exercise of its police power compel assent by all engaged in the industry, is a legislative question which, so far as intrastate commerce is concerned, is within the power of

the Legislature of the State of Maryland and not within federal power. The nature of the business was clearly summarized by the Supreme Court in the Nebbia Case, 291 U. S. at page 517, 54 S. Ct. 505, 507, 78 L. Ed. 940, 89 A. L. R. 1469, as follows: "The fluid milk industry is affected by factors of instability peculiar to itself which call for special methods of control. Under the best practicable adjustment of supply to demand the industry must carry a surplus of about 20 per cent., because milk, an essential food, must be available as demanded by consumers every day in the year, and demand and supply vary from day to day and according to the season; but milk is perishable and cannot be stored. Close adjustment of supply to demand is hindered by several factors difficult to control. Thus surplus milk presents a serious problem, as the prices which can be realized for it for other uses are much less than those obtainable for milk sold for consumption in fluid form or as cream. A satisfactory stabilization of prices for fluid milk requires that the burden of surplus milk be shared equally by all producers and all distributors in the milk shed. So long as the surplus burden is unequally distributed the pressure to market surplus milk in fluid form will be a serious disturbing factor. The fact that the larger distributors find it necessary to carry large quantities of surplus milk, while the smaller distributors do not, leads to price-cutting and other forms of destructive competition. Smaller distributors, who take no responsibility for the surplus, by purchasing their milk at the blended prices (i. e., an average between the price paid the producer for milk for sale as fluid milk, and the lower surplus milk price paid by the larger organizations) can undersell the larger distributors. Indulgence in this price-cutting often compels the larger dealer to cut the price to his own and the producer's detriment."

On the whole case my conclusion is that the prayers of the cross-bills of the defendants asking to specifically enforce the terms and provisions of the license against the plaintiff must be refused and the cross-bills dismissed. With respect to granting affirmative injunctive relief to the plaintiff against the defendants, the latter contend that despite the conclusions reached on the main question of the validity of the license, there should be no injunction issued against the defendants because the plaintiff has not made out a case of probable irreparable injury and its prayers for relief are prema-

ture because the license as to it has not yet been actually revoked by the Secretary and no penalties can accrue against it until this has been done. But in view of the position definitely and formally taken by the Secretary in his cross-bill that the plaintiff is subject to the license and has violated it, and the plaintiff's admitted nonobservance of the license, the procedural objection in this case would seem to be purely formal and not substantial. And in addition to this consideration I think the plaintiff is entitled to an injunction in view of the public statements of the defendants or some of them and particularly those of the Market Administrator, as a representative of the Secretary, to the effect that the plaintiff is a violator of the license; and letters from the Market Administrator to various people in the trade to the effect that they should not deal with the plaintiff as a violator of the license; and if they do, they may be subjecting themselves to possible discipline. The natural effect of all these declarations and communications is such as to unduly interfere with the plaintiff's business and do it material and probably irreparable damage. Under generally similar circumstances injunctions have been issued against the Secretary in a number of recent cases in some of which the distributors' license had been revoked and in others in which it apparently had not been. See Hill v. Darger (D. C. Cal.) 8 F. Supp. 189; Douglas v. Wallace (D. C. Okla.) 8 F. Supp. 379; United States v. Greenwood Dairy Farms (D. C. Ind.) 8 F. Supp. 398; Edgewater Dairy v. Wallace (D. C. N. D. Ill.) 7 F. Supp. 121, supra. See also Irma Hat Co. v. Local Retail Code Authority (D. C.) 7 F. Supp. 687.

The situation here is distinguishable from Hegeman Farms Corp. v. Baldwin, 55 S. Ct. 5, 79 L. Ed. ——, November 5, 1934, where the injunction was refused. There the milk law was held valid and applicable to the plaintiff which had not exhausted its administrative remedies, but here the license is not applicable to the plaintiff at all, and it is therefore not legally obliged to exhaust administrative procedure thereunder. Yarnell v. Hillsborough Packing Co. (C. C. A.) 70 F.(2d) 435, 438, 92 A. L. R. 1475. The situation with respect to the plaintiff's right to an injunction is now materially different from what it was on the application for preliminary injunction, when the matter was discussed at some length (7 F. Supp. 560), as the Secretary is now a party to the case and has filed a cross-bill against the plaintiff.

I am therefore of the opinion that the plaintiff is entitled to an injunction against the defendants.

Counsel may submit a decree in accordance herewith.

Unless advised to the contrary I will assume that the findings of fact and conclusions of law herein stated will be considered as sufficient compliance with General Equity Rule 70½ (28 USCA § 723). If not, I will consider and pass upon more specific findings when submitted by counsel who desire them.